In re CARTER–MONDALE REELEC-TION COMMITTEE, INC., Democratic National Committee, Petitioners,

CARTER–MONDALE REELECTION COMMITTEE, INC., Democratic National Committee, Petitioners,

v.

FEDERAL ELECTION COMMISSION, Respondent,

Ronald Reagan and Reagan for President General Election Committee, Intervenor.

Nos. 80–1841, 80–1842.

United States Court of Appeals, District of Columbia Circuit.

Argued Aug. 12, 1980.
Decided Sept. 12, 1980.

---

103. *Id.*

Thomas D. Barr and Ronald D. Eastman, New York City, were on reply brief in support of Petition for Review in Case Nos. 80–1841 & 80–1842.

Charles N. Steele, Atty., Gen. Counsel, Washington, D.C., with whom Kathleen Imig Perkins, Asst. Gen. Counsel, Washington, D.C., was on brief for respondent in Case Nos. 80–1841 & 80–1842.

Lawrence M. Noble and Marsha G. Gentner, Washington, D.C., also entered an appearance for appellee.

Patrick F. McCartan, Cleveland, Ohio, with whom James R. Johnson, Cleveland, Ohio, was on brief for intervenor.

Before MacKINNON, ROBB and WALD, Circuit Judges.

Opinion for the Court PER CURIAM.

Opinion filed by Circuit Judge WALD, concurring in the decision to affirm.

PER CURIAM.

A complaint herein filed on July 2, 1980 by the Carter–Mondale Reelection Committee ("Carter–Mondale") with the Federal Election Commission ("FEC") requested that said Commission "decline to certify Mr. Reagan and the Republican candidate for Vice President as eligible to receive payments under the [Federal Presidential Campaign] Fund Act." (I Pet.App. 41). In the "alternative" the complaint requested that the Commission "immediately commence such investigation as is necessary to determine the extent to which the [federal election campaign acts] are violated by respondents . . . ." *Id.*

When said complaint was filed neither Mr. Reagan nor Mr. Bush had been nominated for President or Vice President respectively. The ten allegations of the complaint, upon which the complainants based their demand for FEC action, were based almost completely on a collection of allegations gained from widespread newspaper accounts published over six to eight years. On the basis of said newspaper extracts, none of the first nine allegations stated unequivocally that the respondent political

Joseph R. Sahid of the Bar of the Court of Appeals of New York, New York City, Pro hac vice by special leave of Court with whom Ralph L. McAfee, New York City, Timothy G. Smith, Washington, D.C.,

committees, the Republican National Committee, or Mr. Reagan, had violated the law.[1] Instead each allegation was made up of *alternative* charges, i. e., that the law *has been or will be* violated. *Id.* 37–40. Because Messrs. Reagan and Bush had not been nominated such alternative allegations were completely prospective. In addition to the obvious weakness of such alternative allegations, the Carter–Mondale complaint admitted that "we cannot establish" the facts that lay at the very basis for the complaint—that there was an existing and future cooperation and coordination of communication between respondents and a great many Republicans of recognized stature who were supporting or were expected to support the Reagan–Bush ticket in the fall election:

> 4. *Communications Among Respondents*
>
> Without the use of subpoenas, document production and cross–examination under oath, *we cannot establish* the extent to which respondents are to have been in communication and are or are not

acting under common day–to–day control. The Commission has those tools of discovery available and can determine those facts if it should believe that necessary.

I Pet.App. 35. (Emphasis added)

Petitioners' Memorandum in support of its petitions makes the same admission:

> We do not know whether they [Respondent Committees] all are in continuing day–to–day consultation. Such communication may or may not exist . . .

Pet.Memorandum of Law at 28.

On July 18, 1980 the Honorable Ronald Reagan and the Honorable George Bush, having been nominated by the National Convention of the Republican Party on July 16, 1980 as its candidates for President and Vice President, respectively, filed with the Federal Election Commission the required certificate and agreement to make them eligible to receive payments under the Federal Election Campaign Fund Act, 26 U.S.C. § 9001 *et seq.*[2] Thereafter, on July 23,

---

**1.** The tenth allegation charged only that three of the respondent political committees, long before Mr. Reagan became the nominee for President, had improperly "included the name 'Reagan' in their names." See 2 U.S.C. § 432(e)(4) (unauthorized committee "shall not include the name of any candidate in its name").

**2.** See Gov't Br.App. 39a–40a:

July 18, 1980

The Honorable Max L. Friedersdorf
Chairman
Federal Election Commission
1325 K Street, N.W.
Washington, D.C. 20463
Dear Mr. Chairman:

We, Ronald Reagan and George Bush, the nominees of the Republican Party for President and Vice President of the United States, do certify and agree under penalty of perjury pursuant to Chapter 93 of Title 26 of the United States Code to the following conditions in order that we may be eligible to receive any payments under 26 U.S.C. Sec. 9006:

(1) We and our authorized committees have not incurred and will not incur qualified campaign expenses in excess of the aggregate payments to which we will be entitled under 26 U.S.C. Sec. 9004 and Sec. 9006;

(2) No contributions to defray qualified campaign expenses have been or will be accepted

by us or our authorized committees, except to the extent necessary to make up any deficiency in payments received out of the fund on account of the application of 26 U.S.C. Sec. 9006(c), and no contributions to defray expenses which would be qualified campaign expenses but for 26 U.S.C. Sec. 9002(11)(C) have been or will be accepted by us or any of our authorized committees;

(3) We and our authorized committees agree to obtain and furnish to the Commission such evidence as it may request of the qualified campaign expenses of our campaign;

(4) We and our authorized committees agree to keep and furnish to the Commission such records, books, and other information as it may request;

(5) We and our authorized committees agree to an audit and examination by the Commission under Section 9007 and to pay any amounts required to be paid under such section;

(6) We will not knowingly make expenditures in connection with our campaign from our personal funds, or the funds of our immediate families which, in the aggregate, exceed $50,000.

Our agent for the receipt of this payment is Bay Buchanan, Treasurer of Reagan for President, whose address is 901 S. Highland St., Arlington, Va. 22204. The official campaign depository for this fund is the Riggs National

while its administrative complaint of July 2 was pending before the Federal Election Committee, and *before* the Commission had finally acted on said complaint, Carter–Mondale filed the instant petitions in an attempt to have this court prevent the Reagan campaign from receiving its federal funding. Carter–Mondale petitioned under the All Writs Act, 28 U.S.C. § 1651(a) for a writ of mandamus, prohibition or injunction requiring the FEC to deny or delay its certification that Messrs. Reagan and Bush were entitled to federal campaign funds. Accompanying the petition was a motion for a stay of any FEC action on certification until this court had considered the Carter–Mondale petition. Carter–Mondale also petitioned in the alternative under the judicial review provision of the Fund Act, 26 U.S.C. § 9011(a), for review of the actions of the FEC concerning certification of Reagan–Bush as eligible to receive federal funding under the Act.

Petitioner, which expects to support the Democratic Party's candidates in the upcoming presidential election,[3] alleges that Mr. Reagan *has violated or will violate* various provisions of the Federal Election Campaign Act, 2 U.S.C. § 431 *et seq.*, (the "Act") which requires candidates who accept federal campaign funding to limit their spending to the federal funds received. The claim is basically prospective. Accepting federal financing effectively acts as a ceiling on campaign spending by presidential nominees.

Expedition of consideration by this court of said petitions was requested on the allegation that the Federal Election Commission had stated its intention to certify "tomorrow morning, July 24, 1980" the eligibility of Messrs. Reagan and Bush to receive said funds. Likewise on July 23 Mr. Reagan and his General Election Committee moved to intervene and requested immediate oral argument. On July 24, 1980 this court denied the Carter–Mondale motion for a stay, "ORDERED that a special panel be drawn by lot to hear this case on the merits at the earliest possible time," and granted the motion of Mr. Reagan to intervene; on the same day the Federal Election Commission certified the eligibility of said nominees for said offices to receive said money,[4] and said funds were promptly de-

---

Bank of Washington, 1503 Pennsylvania Avenue, N.W., Washington, D.C. 20005.
> Sincerely
> /s/ Ronald Reagan
> Ronald Reagan
> /s/ George Bush
> George Bush

**3.** President Carter and Vice President Mondale had not been officially nominated by the Democratic Party when the complaint was filed with the FEC on July 2, 1980, or the case argued in this court on August 12, 1980.

**4.** See Gov't Br. App. 41a–42a:
> FEDERAL ELECTION COMMISSION
> Washington, D. C. 20463
> Honorable G. William Miller
> Secretary
> Department of the U.S. Treasury
> Washington, D.C. 20220
> Dear Mr. Secretary:
>    Pursuant to 26 U.S.C. Section 9005(a) and the Commission's regulations at 11 C.F.R. Section 143.1, on [July 24] the Federal Election Commission determined that Honorable Ronald Reagan and Honorable George Bush, respectively, the 1980 Republican Presidential and Vice Presidential Candidates, have satisfied the provisions of 26 U.S.C. Section 9003 and 11 C.F.R. Section 141.1 and 141.2 for eligibility to receive public funds for use in their Presidential and Vice Presidential campaigns.
>    Accordingly, the Commission certifies to you that the two named Candidates are entitled under 26 U.S.C. Section 9004 and 11 C.F.R. Section 143.2 to receive a payment in the amount of $29,440,000.00 from the Presidential Election Campaign Fund established pursuant to 26 U.S.C. Section 9006. This amount represents the full entitlement for the 1980 Presidential General Election as specified at 2 U.S.C. Section 441a(c).
>    In accordance with 11 C.F.R. Section 141.-1(d), these Candidates have designated the following person who is entitled to receive the payment from the Fund:
> Ms. Bay Buchanan, Treasurer
> 901 S. Highland Street
> Arlington, Virginia 22204
> The Candidates, in accordance with 11 C.F.R. Section 141.1(d), have designated the following campaign depository:
> Riggs National Bank of Washington
> 1503 Pennsylvania Avenue, N.W.
> Washington, D.C. 20005
> > Sincerely,
> > Max L. Friedersdorf
> > Chairman for the

livered. On July 30 oral argument was set for August 12.

Prior to certification and delivery of the federal funds, the complaint and petitions of Carter–Mondale aimed to stop the certification of Messrs. Reagan and Bush for campaign funds, or, alternatively, to force an immediate investigation and consideration of the allegations set forth in the complaint in support of Carter–Mondale's contention that Messrs. Reagan and Bush were not entitled to said funds. (I Pet.App. 41)

At oral argument, the request for relief was modified from a direction to the FEC to withhold certification, which had been mooted by the certification, to a request that the certification be set aside,[5] and the request was repeated that the FEC be directed to conduct an immediate investigation of the charges contained in the Carter–Mondale complaint.

The past or future violations of the Act as alleged by Carter–Mondale are premised on the existence of campaign committees which are expected to support the Reagan candidacy. Mr. Reagan contends those committees are independent of his campaign–and his control–but Carter–Mondale allege they are illegally supplementing his campaign, *or will do so*, in violation of the spending limits placed on candidates who have received federal funds and agreed to be bound by the Act's financial restrictions on candidates under such circumstances.

We conclude that the entire matter at this time is within the exclusive jurisdiction of the Federal Election Commission. Its counsel stated at oral argument that it is conducting an investigation and that it has not issued any final order on the administrative complaint. At oral argument, all parties agreed that the standard of review was whether the FEC has acted arbitrarily, capriciously, or contrary to law. We find

the petitions to be premature and for that reason they must be dismissed. We also affirm the FEC's action in certifying the nominees' applications for funds.

## I

■ In the context of this appeal, the exclusive jurisdiction of the FEC extends to assure that the Commission's initial investigation is completed, or the statutory time limit allowed for an investigation has expired, before any judicial review is invoked. This is required not only to allow development of the record, but also because the FEC's resolution of this matter may be satisfactory to all concerned and thereby preclude the need for any appellate consideration.

A major demand of the Carter–Mondale complaint and the petitions is that the Commission expedite its investigation and meanwhile rescind its declaration of Reagan's eligibility for federal funding. Such action at this time by the court or the FEC, however, would fly directly into the face of the statutory scheme that Congress provided in the applicable statutes. The Act contains a detailed time schedule within which actions are to be taken by the Commission upon complaints filed with it. Since this case is based upon a complaint filed with the Commission any discussion of the authority and duty of the FEC in other circumstances is not called for and would constitute pure dictum.

Within five days of receiving a complaint, the FEC is required to notify, in writing, any person alleged to have committed a violation, 2 U.S.C. § 437g(a)(1), and that person is given 15 days in which to respond to the complaint. This is for the purposes of allowing the respondent to demonstrate to the FEC that no action need be taken on

Federal Election Commission
John W. McGarry
Vice Chairman for the
Federal Election Commission

5. Counsel for Carter–Mondale stated that the request for relief does not encompass a demand that the funds be returned at this time. However, it is difficult to see any difference be-

tween setting the certification aside and ordering the nominees to return the moneys. There is no substantial difference that we can discern between the two situations as disentitlement to a sum as substantial as nearly $30 million presumably would certainly result in further action by someone to secure its return to the federal treasury forthwith.

the basis of the complaint. *Id.* Except for a shorter period for violations which occur immediately preceding an election, the FEC is required for a period of 30 days to attempt to correct by informal methods of conciliation and persuasion any apparent violations, 2 U.S.C. § 437g(a)(4)(A)(i), (ii). Only if that informal conciliation process fails are formal proceedings authorized. 2 U.S.C. § 437g(a)(6)(A). In any event, the statute allows the Commission a maximum period of 120 days, beginning from the date the complaint is filed, in which to conduct its investigation without judicial intrusion. Only after that period has expired may a person aggrieved by the failure of the FEC to act on a complaint file a petition in this court for review. 2 U.S.C. § 437g(a)(8)(A). As the Eighth Circuit held in *Gabauer v. Woodcock*, 594 F.2d 662, 673 (8th Cir. 1979):

> Congress has explicitly expressed its desire to have the FEC engage in methods of conference, conciliation and persuasion before litigation ensues over any federal election laws. 2 U.S.C. § 437g; S.Rep.No. 94–677, 94th Cong., 2d Sess. 1–2 (1976), *reprinted in* [1976] U.S.Code Cong. & Admin.News, pp. 929–930; H.Conf.Rep.No. 94–1057, 94th Cong., 2d Sess. 45–50 (1976), *reprinted in* [1976] U.S.Code Cong. & Admin.News, pp. 960–965. We should not permit circumvention of such negotiation under the guise of a parallel cause of action. Thus, the claim for future injunctive relief must be dismissed for lack of jurisdiction.[6]

The time schedule of the FEC's work is not of recent origin. As counsel for the petitioner acknowledged at oral argument, the Commission did not complete its audit and assess penalties for the financial violations of the Carter–Mondale campaign in the 1976 Presidential election until 1979. Any petitioner seeking to hurdle the explicit time restraints of the statute must demonstrate far more justification than does Carter–Mondale in this proceeding.

The statute thus provides a strong basis for scrupulously respecting the grant by Congress of "exclusive jurisdiction" to the FEC with respect to civil enforcement of the election laws' provisions. 2 U.S.C. § 437c(b)(1). The campaign financing law does not provide automatic consequences for every violation. Rather, the statute provides for FEC enforcement through both informal consent proceedings and formal proceedings, including proceedings by the Commission and courts. Not every alleged, or even actual, violation is presumed to require a judicial proceeding. Investigations of complaints may result in a vindication of the alleged conduct to the complete satisfaction of all. Or an investigation may result in a determination somewhere in–between a vindication and a violation. But until an investigation is completed, and the FEC has issued an order, or the statutory time limit for action has expired, the FEC is allowed to conduct its investigation, in the pursuance of its duties, without judicial interference.

Accordingly, this petition at this time must be dismissed as premature on the statutory ground that it violates the FEC's exclusive jurisdiction. In other words the statutory scheme deprives this Court of jurisdiction at this time to interfere in the work of the Commission. Under the statute the Commission was not required within the applicable time periods to take any action other than it did take. The highly speculative and alternative nature of the complaint's allegations–addressed to possible future conduct by myriads of citizens and by the complainants' own admission beyond their present ability to "establish"– make them completely premature in a factual sense. This indicates a lack of substantiality in the complaint's allegations.

---

**6.** The Senate version of the 1976 Federal Campaign Act stated: "If, after investigation, the Commission determines that there is reason to believe a violation of the Act or of the public financing provisions of the Internal Revenue Code of 1954 has been committed, or is about to be committed, it is required to make every endeavor to correct or prevent the violation by informal methods prior to instituting any civil action." H.Conf.Rep.No. 1057, 94th Cong., 2d Sess. 45, *reprinted in* [1976] U.S.Code Cong. & Admin.News, p. 961. "The conference substitute [followed] the Senate bill with respect to affording a person against whom a complaint had been made an opportunity to show that no action should be taken." *See id.* U.S.Code Cong. & Admin.News 1976 at 965.

## II

■ An additional, independent ground precludes interfering with the Commission's exclusive jurisdiction and lends further support for the decision to dismiss the petition as premature. The interpretation of the statute, as expressed in *Committee to Elect Lyndon LaRouche*, 613 F.2d 834 (D.C. Cir. 1979), *cert. denied*, 444 U.S. 1074, 100 S.Ct. 1019, 62 L.Ed.2d 755 (1980) precludes withholding funding from a candidate once the *objective* criteria for eligibility are met, because of the important constitutional free speech considerations inherent in public campaign financing. The FEC found that Mr. Reagan had "satisfied" the threshold statutory and regulatory requirements for eligibility to receive federal funding.[7] Ac-

cordingly, it would be a violation of his constitutional free speech rights to delay payment of those funds pending an investigation. *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).

We add, however, that we are not interpreting the statute as barring the FEC from deciding as a matter of policy that it will investigate a complaint, a request for funds, or conduct during a political campaign if it reasonably appears that a patent fraud or other major violation of law is being committed. See 2 U.S.C. § 437d(a)(8) (FEC rulemaking authority); see also *LaRouche, supra.*[8] Commission decisions within its jurisdiction are entitled to great respect by the courts because of the extremely delicate nature of the tremendous power entrusted to it. Nothing requires the Com-

---

7. See n.4, *supra*.

8. In *LaRouche*, a panel of this court held that the FEC is required to withhold certification of a presidential primary candidate until the candidate submits appropriate documentation, and to investigate further, prior to certification, if the candidate's submission "contains patent irregularities suggesting the possibility of fraud." 613 F.2d at 843. Several aspects of our decision in *LaRouche* are distinguishable because *LaRouche* involved federal funding of candidates under the Presidential Primary Matching Payment Account Act, 26 U.S.C. § 9031 *et seq.*, whereas this case involves the Presidential Election Campaign Fund Act, 26 U.S.C. § 9001 *et seq.* The principal distinguishing feature of the Primary Act is that candidates must have "(3) . . . received matching contributions which in the aggregate, exceed $5,000 in contributions from residents of each of at least 20 states, and (4) the aggregate of contributions certified with respect to any person under . . (3) does not exceed $250." 26 U.S.C. § 9033(b). These objective and documentable conditions vary substantially from the statutory conditions for éligibility for federal payments to candidates of major political parties in a presidential election in that the latter conditions involve principally the agreement by the candidates to submit their records to audit and examination and to incur expenses and accept campaign contributions only in accordance with the statutory requirements. The relevant sections of the Fund Act provide:

(a) *In general.* In order to be eligible to receive any payments under section 9006, the candidates of a political party in a presidential election shall, in writing–
(1) agree to obtain and furnish to the Commission such evidence as it may request of

the qualified campaign expenses of such candidates,
(2) agree to keep and furnish to the Commission such records, books, and other information as it may request, and
(3) agree to an audit and examination by the Commission under section 9007 and to pay any amounts required to be paid under such section.
(b) *Major parties.* In order to be eligible to receive any payments under section 9006, the candidates of a major party in a presidential election shall certify to the Commission, under penalty of perjury, that–
(1) such candidates and their authorized committees will not incur qualified campaign expenses in excess of the aggregate payments to which they will be entitled under section 9004, and
(2) no contributions to defray qualified campaign expenses have been or will be accepted by such candidates or any of their authorized committees except to the extent necessary to make up any deficiency in payments received out of the fund on account of the application of section 9006(d), and no contributions to defray expenses which would be qualified campaign expenses but for subparagraph (C) of section 9002(11) have been or will be accepted by such candidates or any of their authorized committees. Such certification shall be made within such time prior to the day of the presidential election as the Commission shall prescribe by rules or regulations.
26 U.S.C. § 9003.
It is apparent that an application of the largely future-looking eligibility criteria of the Presidential Election Campaign Fund Act will depend on investigations conducted after certification, whereas compliance with the historical,

mission to be ineffective in assuring that only candidates who meet the objective criteria of the statute for federal election funds are to receive money from the federal treasury. Nothing in this decision is to be read to the contrary. The Commission has been vested with a wide discretion in order to guarantee that it will be sensitive to the great trust imposed in it to not overstep its authority by interfering unduly in the conduct of elections. The statute has its own penalties, procedures, remedies and time schedules and these should be observed.

It would twist the intent of the statute, on the insubstantial allegations here presented, to grant a right of judicial intervention into the internal functioning of the Commission shortly after the complaint has been filed and thus compel the Commission to take premature action contrary to the

discretion which Congress has conferred upon it in such procedures. Since the statute vests the discretion in the Commission it may exercise that discretion–within the time limits, and in the manner, which the Act provides–free from prodding by courts and campaign opponents. That a court may eventually be able to exercise a very limited review of the exercise of the FEC's discretionary decisions does not permit it to interfere with the Commission's statutory power to make the initial decisions. The Congress vested the Commission with "exclusive jurisdiction"[9] and this court must yield to that exclusivity.

Finally, any discussion in this opinion of an alleged failure of the Commission to act on the complaint would be sheer dicta because the Commission on July 9, 1980, did act thereon and denied the request for an

---

objective criteria of the Presidential Primary Act can often be measured before certification. See *LaRouche, supra*, 613 F.2d at 841–43.

**9.** 2 U.S.C. § 437c(b)(1) provides: "The Commission shall administer, seek to obtain compliance with, and formulate policy with respect to, this Act and chapter 95 and chapter 96 of title 26. The Commission shall have *exclusive jurisdiction* with respect to the civil enforcement of such provisions." (Emphasis added).

The Act previously provided that the Commission had "exclusive primary jurisdiction," 2 U.S.C. § 437c(b)(1) (1976), but an amendment in 1979 dropped the word "primary" without otherwise indicating any legislative intent. Pub.L. No. 96–187, § 306(b)(1), 93 Stat. 1355; see H.R. Rep. No. 422, 96th Cong., 1st Sess. (1979), U.S.Code Cong. & Admin.News 1979, p. 2860. It would seem that "exclusive jurisdiction" would encompass both judicial doctrines of (1) exhaustion of administrative remedies and (2) primary jurisdiction, *Cf. United States v. Western Pacific Railroad*, 352 U.S. 59, 63–64, 77 S.Ct. 161, 164–65, 1 L.Ed.2d 126 (1956).

Such interpretation would also include the congressional intent expressed in the 1976 Committee Report which indicated an intent to make the jurisdiction of the FEC substantially similar to that of the National Labor Relations Board as expressed by the Supreme Court in *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). Justice Frankfurter's opinion in *Garmon* stated: "[Congress in the National Labor Relations Act confided] primary interpretation and application of its rules to a specific and specially constituted tribunal and prescribed a particular procedure for investigation, complaint and notice, and hearing and decision, includ-

ing judicial relief pending a final administrative order."
*Id* at 242, 79 S.Ct. at 778. The opinion also referred to the administrative scheme of the Labor Act as vesting "exclusive primary competence [in] . . . the [National Labor Relations] Board." *Id.* at 245, 79 S.Ct. at 779. In explaining why it proposed to change the phrase describing the FEC's power over civil enforcement from "primary jurisdiction" to "exclusive primary jurisdiction," the House of Representatives Committee Report on H.R. 12406, i.e., the Federal Election Campaign Act Amendments of 1976, stated:
The phrase "exclusive primary jurisdiction" used to describe the congressional intent to centralize the civil enforcement of the Act in the Federal Election Commission is taken from the Supreme Court's decisions in *San Diego Unions v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775. There the Court recognized that Congress, in enacting the National Labor Relations Act, "entrusted administration of the labor policy for the nation to a centralized agency, armed with its own procedures, and equipped with its specialized knowledge and cumulative experience" (*Garmon*, 359 U.S. at 242, 79 S.Ct. at 778). On that basis the Court stated that all complaints bottomed on an alleged violation of the NLRA are within that Agency's "exclusive competence" (*id.* at 245, 79 S.Ct. at 779) and that all other tribunals must therefore "yield to the *primary jurisdiction* of the National Board" (*id*). The Court's ruling in *Garmon* captures the essence not only of the NLRA's administrative scheme, but of this Act's enforcement procedures as well.
H.R. Rep. No. 917, 94th Cong., 2d Sess. 4 (1976). (Emphasis added) This interpretation

"expedited investigation . . . and hearing . . ." [10]

Carter–Mondale suggest that the impact of a delay in actual receipt of the funds on

was adopted by the House and Senate conferees who reported the final version of the 1976 Federal Election Campaign Act Amendments to the Congress. H.Conf.Rep. No. 1057, 94th Cong., 2d Sess. 35 *reprinted in* [1976] U.S.Code Cong. & Admin.News, pp. 946, 950.

The congressional reference to "exclusive primary jurisdiction" is thus expressing more than the judicial doctrine of primary jurisdiction. In a given case it would also include the doctrine which requires the exhaustion of administrative remedies:

"The [judicial] primary jurisdiction doctrine is closely associated with, and sometimes confused with, and in some instances may overlap, the doctrine of exhaustion of administrative remedies or the question of exclusive administrative jurisdiction, or both, having purposes, elements, and effects in common with each."

2 Am.Jr.2d *Administrative Law* § 790 at 691. However, Congress in the Federal Election Campaign Act Amendments of 1976 intended to encompass both doctrines in its reference to "*exclusive* primary jurisdiction" and in its other broad characterizations of the exclusive administrative scheme that it was prescribing.

10. See II Pet.App. 7–8 (Appendix B):
FEDERAL ELECTION COMMISSION
Washington, D.C. 20463
July 9, 1980
*CERTIFIED MAIL*
*RETURN RECEIPT REQUESTED*
Thomas D. Barr
One Chase Manhattan Plaza
New York, N.Y. 10005
RE: Complaint of *Carter–Mondale Presidential Committee, Inc. v. Ronald Reagan, et al* (filed July 2, 1980)
Dear Mr. Barr:

The Commission has voted to deny your request, on behalf of complainant Carter - Mondale Presidential Committee ("C–M"), for expedited investigation of the above–referenced matter and to schedule a hearing with respondents' counsel in order to implement such expedited discovery. The application of 2 U.S.C. § 437g(a)(1) to this matter requires that the respondents alleged in your complaint to have committed a violation of the Federal Election Campaign Act ("FECA") be provided 15 days in which to demonstrate that no action should be taken against them, prior to a Commission determination of reason to believe that such a violation occurred. The Commission has determined that only if a finding of "reason to believe" is made will the Commission proceed with an investiga-

tion of the alleged violation. *See* 2 U.S.C. § 437g(a)(2). Thus, the Commission believes it inappropriate at this time to grant the expedited investigation schedule that C–M has requested. Of course, should the Commission determine, after the appropriate statutory period, that based on the C–M complaint there is reason to believe a violation of FECA occurred, it will proceed with an investigation, and such appropriate relief, as quickly as is possible without denying respondents any due process rights to which they may be entitled.

The Commission has determined, however, that under 26 U.S.C. § 9011(b) it will file an action in the district court seeking declaratory relief to the effect that 26 U.S.C. § 9012 (f) does apply to "independent expenditure committees" and that, as applied, that provision is constitutional. This action will not deal with the question of whether the defendants are in fact independent expenditure committees as opposed to committees connected to Ronald Reagan. That essentially factual issue will be dealt with by the Commission in the normal course of its investigative and enforcement proceedings.

The Commission has also voted to deny the C M request to make the investigation of this matter, should one be undertaken, public. 2 U.S.C. § 437g(a)(12) expressly forbids the Commission from making such investigation public, absent the written consent of the respondent(s) permitting the Commission to do so. No exceptions to this confidentiality rule are provided in FECA.

The Commission appreciates your concern that this matter be resolved as soon as possible, and continues to welcome any information or other aid the Carter Mondale Committee can provide. If you should have any questions concerning the procedures followed by the Commission in reviewing a complaint, or with respect to the foregoing information, please call Marsha Gentner or Patricia F. Bak, the attorneys assigned to this matter, at (202) 523-4057.

    Sincerely,
    /s/ Charles N. Steele
    Charles N. Steele
    General Counsel
cc: Ronald Reagan
    Jesse Helms
    Loren Smith
    John T. Dolan
    Harrison H. Schmitt
    Roderick M. Hills
    William Brock
    John C. White

the Reagan–Bush campaign would be minimal since the major campaigning will not begin until after Labor Day, a traditional jumping off point for Presidential elections. This is the siren song of just a little interference. The Reagan forces oppose petitioner's contention, citing a need for advance commitments to prepare for the major start of the campaign. Be that as it may, the statute does not invest Mr. Reagan's campaign opponents, or this court, with the power to time the opening of the purse strings, or to assess the time at which funds are necessary. Nor is the Commission vested with authority to determine that funding certification, which acts as authority for the United States Treasury to actually dispense funds to the candidate, can be delayed without harm. This is underscored by the discussion in *LaRouche, supra*.[11]

At the 1976 Congressional hearings on federal election campaign financing, Robert Strauss, then Chairman of the Democratic National Committee, and the present chairman of Carter–Mondale, addressed the question of timing in dispensing campaign funds for presidential primaries:

> My responsibilities as Chairman of the Democratic National Committee, make me focus on the incalculable problems faced by my presidential candidates as long as the status of the FEC remains in question. Most of our candidates cannot sustain even a lapse of a few days in the payment of federal matching funds. Many of our campaigns are operating on a day–to–day cash flow. A time lapse in the certification and distribution of feder-

al funds could be so disruptive to the political process that it could have a dangerous impact on the outcome of both the Democratic and Republican Presidential nominating systems. This must be avoided.

Federal Election Campaign Act Amendments, 1976: Hearing on S.2911, S.2912, S.2918, S.2953, S.2980 and S.2987 Before the Subcommittee on Privileges and Elections of the Senate Committee on Rules and Administration, 94th Cong., 2d Sess. (1976), *reprinted in* FEC, Legislative History of Federal Election Campaign Act Amendments of 1976 (1977).

The foregoing statement of Mr. Strauss points out the tremendous damage that could be brought about by a premature intrusion into the statutory time schedules and Commission decisions.[12]

### III

■ Because the petitions were brought prematurely and invades the FEC's exclusive jurisdiction, they must be dismissed. We also affirm the action of the FEC in certifying the eligibility of Messrs. Regan and Bush for federal election campaign funds since neither the complaint nor the petitions on their face allege sufficient facts to justify a revocation of the certification by the Commission. The Commission has in no way acted in an arbitrary, capricious or unlawful manner.

*Judgment accordingly.*

---

**11.** It is also clear on the facts here that judicial intervention at this time when the statute places the matter within the exclusive primary jurisdiction of the Commission would violate the confidential treatment of notification and investigation that is expressly required by 2 U.S.C. § 437g(a)(12)(A):

> (12)(A) Any notification or investigation made under this section shall not be made public by the Commission or by any person without the written consent of the person receiving such notification or the person with respect to whom such investigation is made.

**12.** The affidavit of Mr. Strauss in support of the Carter–Mondale complaint contrasts the "independent" committees to which he objects with the "political action committees and other special interest groups sanctioned by the law" (and presumably qualifying for special treatment under § 501 of the Internal Revenue Code). I. Pet.App. 49. The relevance of that comment to this case is not immediately apparent. If it was inserted to alert the court to the contention that a presidential candidate who seeks or accepts, directly or indirectly, financial support from *such committees* acting in conjunction, consultation or consent with him, or with the consent of his authorized committees, would not be in violation of the federal election law, we intimate no position whatsoever on these obvious statutory and equal protection issues.

WALD, Circuit Judge, concurring in the decision to affirm:

Because my own review of the administrative complaint filed by the petitioners in this case convinces me that the Federal Election Commission (FEC or Commission) had no obligation to conduct an investigation before certifying, I join in affirming the Commission's certification.[1] My reasoning, however, is sufficiently different to require a separate statement.

Underlying my concurrence are several conclusions that I have drawn from my study of the statutes here at issue and from the policies they are designed to serve. These conclusions, explained in more detail below, are as follows: First, when an administrative complaint has been filed before the FEC determines to certify a candidate as eligible for public funding and that complaint charges that the candidate has breached or is about to breach the funding eligibility criteria, the Commission has both the authority and the obligation to examine the face of the complaint and its accompanying materials before certifying the candidate's eligibility. Second, the Commission has the authority and under circumstances not present here may have an obligation to conduct its own investigation of the candidate's eligibility for public funding before it determines to certify. Third, any such investigation which it may decide to undertake, whether on the basis of information initially supplied through the medium of an administrative complaint or on the basis of information independently acquired, is not subject to the elaborate statutory machinery and strict statutory timetable of 2 U.S.C. § 437g (1976) *as amended by* Federal Election Campaign Act Amendments of 1979, Pub. L. No. 96–187, § 108, 93 Stat. 1339, 1358–62 (1980).

1. Materials Properly Considered in Certification.

The Presidential Election Campaign Fund Act (the Fund Act), 26 U.S.C. §§ 9001–9013 (1976), obliges the Commission both to determine eligibility for public funding, 26 U.S.C. § 9005 (1976) and to ensure that the funds are put to eligible uses, *id.* § 9007; it also empowers the Commission "to conduct such examinations[,] . . . audits . . . [and] investigations . . . as it deems necessary to carry out [its] functions and duties [under the Fund Act]." *Id.* § 9009(b). In my judgment this combination of statutory obligations and statutory authority confers on the Commission both the discretion and the duty to examine the face of an administrative complaint charging violations of the Fund Act's eligibility requirements before certifying a candidate for public funding.

At the administrative level in this case the Commission adopted an ambiguous position which could have been read to preclude examination of anything outside the four corners of the candidate's submissions under 26 U.S.C. § 9003 (1976).[2] This position was clarified, however, at oral argument, when the Commission expressly reserved the question whether the Commission might examine into "overt acts" which indicated a candidate's intention to defy the eligibility requirements for public funding. But if there are *any* circumstances under which such an investigation might be appropriate, then in all cases available materials in which eligibility is challenged must at least

1. For the same reason I would dismiss the petition for a writ of mandamus or prohibition, which I view as addressing the Commission's obligations with respect to the administrative complaint only insofar as they bear on the FEC's determination of initial eligibility for public funding. *See* note 3, *infra.*

2. Responding to a letter from counsel to the petitioners, the FEC's general counsel stated:

The Commission, as it has previously notified you, will not resolve the many factual and other issues alleged in your complaint prior to determining whether it will certify Mr. Reagan and Mr. Bush. The commission considers that its role under the Presidential Election Campaign Fund Act with regard to the certification of eligibility of candidates to receive public funds for the general election is mandatory if the statements and certifications submitted by applicant candidates meet the requirements of 26 U.S.C. § 9003.

Letter from Charles N. Steele, FEC General Counsel to Thomas D. Barr, counsel for Carter–Mondale Reelection Committee (Jul. 22, 1980), Petitioners' Appendix B, Tab 9.

be examined to determine whether those circumstances exist. The Commission's position would make little sense unless it were also obliged to examine available materials to determine whether they establish overt acts.

That the Commission has authority in determining eligibility for funding to venture outside the documents submitted expressly in support of the candidate's eligibility is buttressed by this court's decision in *Committee to Elect Lyndon LaRouche v. FEC*, 613 F.2d 834 (D.C. Cir. 1979), *cert. denied*, 444 U.S. 1074, 100 S.Ct. 1019, 62 L.Ed.2d 755 (1980), interpreting the Presidential Primary Matching Payment Account Act, 26 U.S.C. §§ 9031–9042 (1976). In that case the statute was interpreted to permit a pre–certification investigation when the "threshold submission (or the submission *together with other reports on file with the Commission*) contains patent irregularities suggesting the possibility of fraud," *id.* at 842 n.14 (emphasis supplied).

The obligation to examine extrinsic materials which I believe the Act imposes is a limited one. As applied to the facts presented by the parties in this case, the FEC would be required merely to examine the face of the administrative complaint and its accompanying materials to determine whether an investigation should be undertaken before an eligibility determination is made. In this or other cases the thoroughness of the required examination would vary with the amount of time available. Thus, if a long complaint with hundreds of exhibits were filed hours before a

certification of eligibility would otherwise be expected, *see* 26 U.S.C. § 9005 (1976), only a cursory examination would be required. In any case where such an examination were undertaken the record of the certification should reflect this fact and if a decision were made not to conduct a pre–certification investigation, a very brief statement of the reasons for this decision should be included.

I do not think these limited administrative obligations or judicial review of the certification in light of these obligations would unduly interfere with the Commission's primary jurisdiction over administrative complaints under 2 U.S.C. § 437g or with its exclusive jurisdiction over civil enforcement of the Fund Act under 2 U.S.C. § 437c(b)(1), or that they would thwart the intent of the enforcement mechanisms provided by these sections. To suggest that because of the doctrines of primary or exclusive jurisdiction the court may not inquire into the Commission's examination of the face of an administrative complaint and its accompanying materials before certifying a candidate's eligibility would to my mind be putting the cart before the horse.

Although Congress clearly intended that the Commission have primary and exclusive jurisdiction over the administrative complaint mechanism and over other investigations conducted under 2 U.S.C. § 437g,[3] Congress also provided, in an earlier–enacted section of the Fund Act, 26 U.S.C. § 9011(a) (1976), for judicial review of FEC certifications. The possibility that a certification or refusal to certify would be chal-

---

**3.** *See* H.R. Rep. No. 917, 94th Cong., 2d Sess. 4 (1976), *reprinted in* FEC, Legislative History of Federal Election Campaign Amendments of 1976, at 797, 804 (1977); H.R. Rep. No. 1438, 93d Cong., 2d Sess. 94 (1974), *reprinted in* FEC, Legislative History of Federal Election Campaign Amendments of 1974, at 945, 1038 (1977). However, to state that the FEC has primary jurisdiction over administrative complaints and exclusive jurisdiction over the civil enforcement of the Fund Act does not and cannot answer the question–over which we have specific jurisdiction under 26 U.S.C. § 9011(a)–whether a given certification is proper. Once certification has occurred, neither a petition for review under section 9011(a) nor an

application for an extraordinary writ addressed to the Commission's certification is properly dismissed on the grounds of the agency's primary or exclusive jurisdiction, although a determination of the propriety of the certification or of the need for extraordinary relief and consideration of the remedies available in this context may well be informed by those doctrines. *See* text following this note. I therefore do not join in the majority's dismissal of these petitions on the ground of the agency's primary or exclusive jurisdiction. It is true, of course, that the petitions in this case were actually filed before the Commission's certification, but I do not read the majority's conclusion that the petitions are premature to rest on this ground.

lenged in this court on the basis of facts which are still the subject of an administrative complaint is thus implicit in the statutes.

If we would .not rule out the possibility that a pre–certification investigation of extrinsic materials might ever be warranted, we surely should not preclude examination or investigation of such materials merely because they are the stuff of an administrative complaint. Without a clear statutory directive to do so, neither the Commission not this court should deliberately blind itself to materials available to the agency which address the candidate's eligibility for public funding. That directive is lacking in this case.

First, of course, the doctrine of primary jurisdiction "governs only the question whether court or agency will *initially* decide a particular issue, not the question. whether court or agency will *finally* decide the issue." [4] Imposing an obligation of the Commission to determine initially whether the allegations of an administrative complaint warrant further investigation before certifying could not, therefore, violate the doctrine of primary jurisdiction. Second, insofar as a petition addresses the propriety of the Commission's certification, application of any exhaustion doctrine is wholly inappropriate in light of the Fund Act's provision for judicial review of certifications, 26 U.S.C. § 9011(a) (1976). Third, I do. not think the imposition of this obligation, either through the kind of examination required to be undertaken or the type of record necessarily created in either forum will prejudge the question ultimately to be resolved through investigation of the administrative complaint and in this manner interfere with enforcement under section 437g or with 437c's grant of "exclusive" jurisdiction with regard to the civil enforcement of the Fund Act, which Act of course, provides for judicial review of "any certification, determination, or other action by the Commission ... pursuant to the provisions of this [Act]." 26 U.S.C. § 9011(a). Finally, I do not think that these limited obligations would frustrate the intent of section 437g's confidentiality provision, 2 U.S.C. § 437g(12) (1976), whose express protection extends by statute to a "*notification or investigation made under this section.*"

When, as in this case, the record of decision transmitted by an administrative agency does not clearly indicate that consideration was given to relevant factors, the usual disposition is to remand the record for supplementation; but because of the strong public interest in prompt resolution of this matter, I believe this court would be warranted in conducting an independent examination to determine whether consideration of the relevant factors would have obliged the agency to reach a different conclusion.[5] *Cf. LaRouche*, 613 F.2d at 847. I thus reach the question of the circumstances under which the Commission's certification, in the face of an administrative complaint charging violations of the Fund Act's eligibility

4. 3 K. Davis, Administrative Law Treatise § 19.01 at 3 (1958).

5. Nothing in the record indicates that the Commission would have withheld certification pending an investigation if it had expressly considered the allegations of the administrative complaint in determining eligibility for funding. That Commission members were at least aware of the administrative complaint and of the filing of the petitions now before us is clear. Letter from Charles N. Steele, FEC General Counsel, to Thomas D. Barr, counsel for Carter -Mondale Reelection Committee (Jul. 9, 1980), Petitioners' Appendix B, Tab 3 (Commission voted to deny complainant's request for expedited investigation but also voted to institute district court action under section 9011(b) (*see* note 12, *infra*)); Partial Transcript of the Proceedings of the Federal Election Commission, Regular Meeting, Thursday, July 24, 1980, Respondent's Appendix 62a, 64a–66a (indicating awareness of pending petitions). To the extent the Commission's position in this court can be imputed to the Commission acting in its eligibility ˙determination capacity, the indications are that the Commission, had it expressly considered the complaint and its materials, would have determined not to conduct an investigation before certifying. Counsel for the Commission, reserving the question whether overt acts might warrant a pre-certification investigation, here argued that the administrative complaint and its accompanying materials do not present the kind of circumstances under which such an investigation would have been justified.

requirements, can be considered "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[6]

2. Pre–Certification Investigations.

In my judgment a decision to certify without first investigating could be overturned on the merits by this court only when the materials available to the Commission present on their face an extremely clear and very substantial case of fraud or fraudulent intent.[7]

For the statement of this standard I rely on the one hand on a reading of the statute and of this court's decision in *LaRouche* that would not preclude examination into a candidate's state of mind with respect to the eligibility requirements for public funding and on the other hand on the obvious policy considerations underlying the statute which militate against the delay in certification which an investigation may entail.

As already noted, the Fund Act authorizes the Commission "to conduct . . . such investigations . . . as it deems necessary to carry out [its] functions and duties [under the Fund Act]." 26 U.S.C. § 9009(b) (1976). One of those duties is, of course, the determination of eligibility for public funding. *Id.* § 9005. Because the Fund Act's eligibility requirements, 26 U.S.C. § 9003 (1976), look largely to the future and depend on their face on the candidate's intention to abide by the Fund Act's limitations and record–keeping requirements, a challenge to a candidate's eligibility under this section would almost inevitably raise questions of a candidate's state of mind. Inquiring into a candidate's knowledge and intent is at best a distasteful prospect. But to hold that for this reason the Commission may never conduct an investigation before certifying under section 9005 would threaten to make a mockery of the Fund Act. If there were no

circumstances under which a pre–certification investigation were permissible the public could conceivably witness the spectacle of millions of taxpayer dollars being channelled to a candidate who had, before certification, either flouted the eligibility requirements or stated his intention to defy the restrictions imposed by the Fund Act on publicly financed candidates. No reasonable interpretation of the Fund Act requires the statement of such a rule and the FEC, understandably, does not press such an interpretation upon us.

It is true that this court in *LaRouche* expressed a preference for the application of objective standards in determining eligibility, 613 F.2d at 844, rejecting a subjective focus, which as argued to the court, appeared both unduly restrictive of the FEC's role in ensuring funding for only eligible candidates and, paradoxically, overly vague, providing only inexact standards, *id.*, which would not have sufficiently circumscribed the FEC's discretion or have permitted meaningful judicial review, *id.*, and which raised the spectre of "lengthy investigations into what a candidate knew, or should have known, about his campaign contributions at the time he applied for . . . funds." *Id.* However, the question whether the Commission could have conducted a pre–certification investigation if the candidate had met all the "objective" criteria for eligibility stated by that panel was a question not posed by the court's analysis of the facts in *LaRouche.* Accordingly, I do not read *LaRouche* to have completely ruled out a pre–certification investigation when submitted materials suggest on their face that the candidate intends to violate or has knowingly violated the eligibility requirements for public funding.

This is not to suggest that the public interest in prompt certification of major–

---

**6.** 5 U.S.C. § 706(2)(A) (1976). *See* 117 Cong. Rec. 41936 (1971) (remarks of Sen. Pastore) (suggesting arbitrary or capricious standard). *Cf. LaRouche*, 613 F.2d at 845–46.

**7.** At oral arguments petitioners conceded that given the public interest in prompt certification the Commission may properly exercise its dis-

cretion to certify even in the face of a "substantial" administrative complaint, suggesting that the standard applicable to a Commission determination in such circumstances would be "the same standard perhaps as this court can apply when it considers whether to grant a temporary restraining order."

party candidates is not great. One would scarcely contest the importance of preventing the Commission's administrative complaint procedures from becoming a tool for the partisan obstruction of legitimate campaign activities. One of the underlying purposes of public funding–to permit the candidate to avoid a diversion of energy from important campaign issues to the raising of funds [8]–would be frustrated if the candidate were left for more than a brief period on tenterhooks while an administrative investigation progressed.

For this reason, if the lengthy enforcement mechanism provided by section 437g were the only investigatory option available to the Commission, the strong policy considerations in favor of prompt certification would perhaps require a conclusion that certification must proceed even in the face of clear and substantial allegations of fraud or fraudulent intent. But, as explained below, I do not think the FEC is tied under the Fund Act to the administrative investigation authorized by section 437g. Because the Fund Act independently authorizes investigations, there is room in the statute for a very brief investigation of the charges before a certification is made.

Having thoroughly reviewed the petitioners' administrative complaint and its accompanying materials, I conclude that the standard which must be met before the Commission's certification can be overturned on

the merits was not met in this case. The complaint raises difficult and unresolved legal questions [9] and alleges many "facts" of questionable materiality, given the uncertainty of the law. Taken either as a whole or piecemeal, however, the complaint does not present an extremely clear and very substantial case of fraud or fraudulent intent and for this reason the Commission's decision can be affirmed.

3. The Relationship of Fund Act Investigations to 2 U.S.C. § 437g.

Although the Commission may conduct an investigation of Fund Act violations pursuant to an administrative complaint or on its own initiative under 2 U.S.C. § 437g, I find no indication in the legislative history of this provision that section 437g was intended to be the exclusive route for Fund Act investigations.[10] At the time section 437g was first enacted, the Fund Act was also amended to substitute the newly created Federal Election Commission for the Comptroller General as the party responsible for administering that Act,[11] but the authority to conduct "investigations"–already conferred by section 9009 of the Fund Act–was retained without change. In the absence of any express indication to the contrary I must conclude that investigations under section 9009 are not subject to the elaborate statutory machinery and strict statutory timetable of section 437g.[12]

8. S.Rep. No. 689, 93d Cong., 2d Sess. 6 (1974), *reprinted in* FEC, Legislative History of Federal Election Campaign Act Amendments of 1974 at 93, 102 (1977).

9. For example, the extent to which the Federal Election Campaign Act's contribution attribution provisions, *see, e. g.,* 2 U.S.C. § 441a(7),(8) (1976), or criteria for determining "independent expenditures," *see* 2 U.S.C. § 431(17) (1976), apply to the determination of "contributions" for purposes of eligibility for public funding, 26 U.S.C. § 9003(b)(2) (1976), is unclear. At oral argument counsel for the petitioners stated that the question "whether the contribution provision of the FECA applie[s] to the certification provision of the Fund Act" is "a terribly important and interesting question, going to the heart of our allegation and our complaint."

10. As intervenors here have noted there is much legislative history indicating both that

the FEC has primary jurisdiction under section 437g and that the Commission is the exclusive agency in which civil enforcement responsibility resides, Brief for Intervenors at 33–35 & n.26; but, especially in view of the Fund Act's provision for administrative investigations, 26 U.S.C. § 9009(b) (1976), neither the grant of primary jurisdiction nor the conferral of exclusive jurisdiction mandates the agency's use of a single, cumbersome administrative mechanism in carrying out all the responsibilities with which it is charged under that Act.

11. Federal Election Campaign Act Amendments of 1974, Pub.L.No. 93–443, § 404(c)(13), 88 Stat. 1263, 1293 (1974).

12. Indeed, these two investigatory options may not appear to exhaust the panoply of methods available to the Commission to fulfill its obligations under the Fund Act. It is a matter of

4. Conclusion.

In considering eligibility for public funding in this case the Commission should have examined the administrative complaint and its accompanying materials, but such an examination would not have required the Commission to delay certification pending an investigation. I therefore join in affirming the Commission's certification.

public record that the Commission has in fact already employed another weapon in its enforcement arsenal by bringing in the district court here an action for declaratory relief asserting that the activities of three groups organized to promote the Reagan presidency–groups which were also named as respondents in the petitioners' administrative complaint–will violate 26 U.S.C. § 9012(f)(1) (1976) (prohibiting unauthorized expenditures of more than $1000 on behalf of a publicly funded candidate). *FEC v. Americans for Change,* Civ. No. 80–1754 (D.D.C., filed Jul. 14, 1980). By order issued August 28, 1980 (with opinion to follow) the three–judge court convened in that case has resolved cross–motions for summary judgment in favor of the defendant groups. *Id.* (Aug. 28, 1980). The order does not indicate on what basis summary judgment was granted and as of this writing the three–judge court has not issued its opinion. At the very least, however, the bringing of the action illustrates the Commission's view that the administrative complaint mechanism is not the sole route to enforcement of the Fund Act.