COMMON CAUSE et al., Plaintiffs,

v.

Harrison SCHMITT et al., Defendants,

Federal Election Commission, Intervenor.

FEDERAL ELECTION COMMISSION, Plaintiff,

v.

AMERICANS FOR CHANGE et al., Defendants.

Civ. A. Nos. 80–1609, 80–1754.

United States District Court, District of Columbia.

Sept. 30, 1980.

Michael L. Burack, Wilmer & Pickering, Washington, D. C., for plaintiffs in Civ. A. No. 80–1609.

Jan W. Baran, William H. Schweitzer, William A. Long, Washington, D. C., for defendants in Civ. A. No. 80–1609.

Philip A. Lacovara, Arthur B. Spitzer, American Civil Liberties Union Fund of the National Capital Area, Washington, D. C., amicus curiae.

Patricia F. Bak, Charles N. Steele, Lawrence M. Noble, Marsha G. Gentner, Washington, D. C., for plaintiffs in Civ. A. No. 80–1754.

Jan W. Baran, William H. Schweitzer, Lee T. Ellis, Jr., Rebecca L. Jackson, Washington, D. C., Roderick M. Hills, Irwin Goldbloom, William A. Long, Robert K. Burgess, Edward Sonnenschein, Jr., Washington, D. C., Robert R. Sparks, Jr., McLean, Va., Paul D. Kamenar, Washington, D. C., for defendants in Civ. A. No. 80–1754.

Before TAMM and WILKEY, Circuit Judges, and PENN, District Judge.

## OPINION

WILKEY, Circuit Judge:

The Federal Election Commission ("FEC"), and Common Cause, a public interest organization, sued in two separate actions various groups of Ronald Reagan supporters who plan to spend monies to promote his chances in the 1980 presidential election. Both plaintiffs alleged that the plain language of section 9012(f) of the Presidential Election Campaign Fund Act ("Fund Act")[1] prohibits the defendants' proposed expenditures which will exceed $1,000 to further the election of Ronald Reagan. As the Republican candidate for President, Mr. Reagan is entitled under the Fund Act to receive, and has already accepted, almost $30 million in public campaign funding. Pursuant to 26 U.S.C. sec-

---

1. 26 U.S.C. § 9001 et seq. (1976).

tion 9011(b) this three-judge district court was convened with jurisdiction to "implement or construe" the Fund Act. The statute further directs the court to act as quickly as practicable. On 19 August 1980 we heard oral argument on the scope and constitutionality of section 9012(f). On 28 August 1980 the court issued two expedited Orders granting, *inter alia*, summary judgment for the defendants in the FEC action, and dismissing the Common Cause action. In this Opinion we develop our reasoning for the two Orders of 28 August.

## I. STATUTORY PROHIBITION AGAINST EXPENDITURES BY POLITICAL COMMITTEES

### A. *Background*

The defendants in both actions are various organizations, as well as a few of their organizers, who are broadly soliciting contributions from individuals who favor Ronald Reagan for president. These organizations plan to use the money they collect—they hope to raise and spend millions of dollars—to hire professional media and political consultants and purchase advertising, *etc.* They intend these expenditures to yield an effective program to promulgate their political views before the November election. The defendant organizations have registered with the FEC as "political committees."[2] The defendants' literature and solicitation materials detail their support for Ronald Reagan and outline their intention to spend the sums collected to realize their collective aspirations for the presidential election.

### B. *Statutory Basis: Jurisdiction and Substantive Prohibition*

#### 1. *Jurisdiction in a Three-Judge District Court*

■ The FEC is plainly authorized by section 9011(b)(1) of the Fund Act to seek a declaratory judgment "that section 9012(f) validly prohibits expenditures in excess of $1,000 such as defendants have indicated they intend to undertake."[3] The statute is set out in full in the margin.[4] The right of Common Cause to bring such an action, on the other hand, is equivocal. We will reserve all discussion of the Common Cause lawsuit until Parts IV and V below.[5]

The statute requires a three-judge district court to entertain actions to "imple-

---

**2.** A "political committee" is

> any committee, association, or organization (whether or not incorporated) which accepts contributions or makes expenditures for the purpose of influencing, or attempting to influence, the nomination or election of one or more individuals to Federal, State, or local elective public office.

26 U.S.C. § 9002(9) (1976).

> Under another statute, the Federal Election Campaign Act of 1971 ("FECA"), 2 U.S.C. § 433(a) (1976), any "political committee" that is not an authorized campaign committee must file a statement of organization with the FEC within 10 days after becoming a political committee within the meaning of 2 U.S.C. § 431(4). The definition of "political committee" within the FECA is roughly the same as the definition of that term in the Fund Act.

**3.** Motion of FEC for Summary Judgment at 30.

**4.** 26 U.S.C. § 9011(b) (1976) provides:

> § 9011. Judicial review
> (b) Suits to implement chapter.—
> (1) The Commission, the national committee of any political party, and individuals eligible to vote for President are authorized to institute such actions, including actions for declaratory judgment or injunctive relief, as may be appropriate to implement or contrue [*sic*, quoted here as "construe"] any provision of this chapter.
> (2) The district courts of the United States shall have jurisdiction of proceedings instituted pursuant to this subsection and shall exercise the same without regard to whether a person asserting rights under provisions of this subsection shall have exhausted any administrative or other remedies that may be provided at law. Such proceedings shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of title 28, United States Code, and any appeal shall lie to the Supreme Court. It shall be the duty of the judges designated to hear the case to assign the case for hearing at the earliest practicable date, to participate in the hearing and determination thereof, and to cause the case to be in every way expedited.

**5.** Common Cause requested substantial discovery of defendants as well as injunctive relief, neither of which was integral to the FEC complaint. *See* Parts IV–V *infra*.

ment or construe" the Fund Act. This action to test the scope and validity of section 9012(f) is within the jurisdiction of this court to "implement or construe" provisions of the Act.

### 2. Prohibition Against Expenditures by "Political Committees"

■ The plain language of section 9012(f) proscribes categorically the defendants' planned expenditures. They, the defendant "political committees," plan "to incur expenditures" "in an aggregate amount exceeding $1,000" "to further the election" of presidential candidate Reagan. This program of expenditures is a criminal offense according to the statutory section which is entitled "Criminal penalties." In pertinent part it reads:

§ 9012. Criminal penalties

(f) Unauthorized expenditures and contributions.—

(1) Except as provided in paragraph (2), it shall be unlawful for any political committee which is not an authorized committee with respect to the eligible candidates of a political party for President and Vice President in a presidential election knowingly and willfully to incur expenditures to further the election of such candidates, which would constitute qualified campaign expenses if incurred by an authorized committee of such candidates, in an aggregate amount exceeding $1,000.

\* \* \* \* \* \*

(3) Any political committee which violates paragraph (1) shall be fined not more than $5,000, and any officer or member of such committee who knowingly and willfully consents to such violation and any other individual who knowingly and willfully violates paragraph (1) shall be fined not more than $5,000, or imprisoned not more than one year, or both.

We understand section 9012(f)(1) to prohibit *all* expenditures over $1,000 by political committees including "*independent expenditures.*" An independent expenditure is an expense incurred by a political committee free of any coordination with the official and authorized campaign committees of the candidate. We reject the limiting construction of section 9012(f) offered by defendants Harrison H. Schmitt, Carl T. Curtis, and Americans For Change. They suggest that the provisions may be interpreted as prohibiting only coordinated expenditures which have been authorized or requested by a publicly funded presidential candidate.[6] Though this "saving" construction would neatly preserve the statutory proscription from constitutional infirmity under *Buckley v. Valeo*[7] the language of the section will not support this rescue.

The section's plain terms apply broadly to *all* expenditures and this is in contrast with another section, section 9002(11) of the Fund Act, where Congress did adopt limiting language of this kind. If the limiting construction were correct, that is, if the expenditure prohibition applied only to expenditures authorized or requested by the candidate, then the section's existing proviso that only such expenditures are prohibited as "would constitute qualified campaign expenses if incurred by an authorized committee of [the] candidate[ ]" would be more or less superfluous. The prohibited coordinated, or non-independent, expenditures would then *all* be qualified campaign expenses[8] rendering the proviso unnecessary.

Also, another election law statute, 2 U.S.C. section 441a(a)(1)(A), already prohibits individuals, groups, and committees from making contributions in excess of $1,000. A "contribution," however, is defined, in 2 U.S.C. section 441a(a)(7)(B)(i), to include "expenditures made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate...." Hence we can only read

---

6. *See* Memorandum of Points and Authorities in Support of Motion to Dismiss of Defendants Harrison H. Schmitt, Carl T. Curtis and Americans For Change at 10–13.

7. 424 U.S. 1, 46–47 & n. 53, 96 S.Ct. 612, 648, 46 L.Ed.2d 659 (1976).

8. *See* 26 U.S.C. § 9002(11) (1976).

the expenditure prohibition in section 9012(f) to mean what it says: *all expenditures* over $1,000 by political committees which further a presidential candidate's election are illegal. We are compelled then to determine the constitutionality of this expenditure limitation consistent with the First Amendment analysis conceived in *Buckley v. Valeo.*[9]

## II. FIRST AMENDMENT ANALYSIS UNDER BUCKLEY v. VALEO

In *Buckley v. Valeo*[10] the Supreme Court held that the campaign expenditure ceilings imposed by Congress in the Federal Election Campaign Act of 1971 ("FECA")[11] were unconstitutional. The Court reasoned that a statutory restriction on amounts which citizens, groups, or candidates could expend in a political campaign was an impermissible limitation of the freedoms of speech and association protected by the First Amendment. The watershed case controls the election law case before this court. Thus a discussion of *Buckley* is appropriate before beginning our own constitutional analysis of the severe expenditure ceiling imposed on political committees.

### A. *Campaign Expenditures Are Speech*

█ The Supreme Court made quite clear in *Buckley* that the power of Congress to regulate federal elections was well-established under the Constitution.[12] That power to regulate, however, is not unbounded; it must of course be exercised consistent with rights guaranteed by the Constitution.

Campaign activity is speech on the highest constitutional plane. "The First Amendment affords the broadest protection to such political expression in order 'to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people.' "[13] Moreover, political expression in a campaign is associational activity also protected by the First Amendment. The Constitution guarantees the " 'freedom to associate with others for the common advancement of political beliefs and ideas,' a freedom that encompasses '[t]he right to associate with the political party of one's choice.' "[14]

The Supreme Court noticed in *Buckley* the reality that public communication is expensive. Free speech is costly. Television, radio, newspapers, buttons—the Court has acknowledged that "these expensive modes of communication [are] indispensable instruments of effective political speech."[15] A restriction on the amount which can be spent on political communication is a practical limitation on the political issues which can be addressed or answered in a campaign. It also limits the range of participants in the political debate, and the size of the audience.

### B. *Level of Judicial Scrutiny*

█ It was strenuously argued to the Supreme Court in *Buckley* that *expenditures* in a campaign entailed primarily "conduct" and not "speech." The Court rejected this contention emphatically,[16] stating that "this Court has never suggested that the dependence of a communication on the

---

**9.** 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).

**10.** *Id.* at 12–59, 96 S.Ct. at 631–654.

**11.** 2 U.S.C. § 431 *et seq.* (1976).

**12.** *Buckley v. Valeo,* 424 U.S. at 13, 96 S.Ct. at 631.

**13.** *Id.* at 14, 96 S.Ct. at 632 (quoting *Roth v. United States,* 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498 (1957)).

**14.** *Id.* at 15, 96 S.Ct. at 632 (quoting *Kusper v. Pontikes,* 414 U.S. 51, 56, 57, 94 S.Ct. 303, 307, 308, 38 L.Ed.2d 260 (1973) (*quoted in Cousins*

*v. Wigoda,* 419 U.S. 477, 487, 95 S.Ct. 541, 547, 42 L.Ed.2d 595 (1975)).

"The First Amendment protects political association as well as political expression." *Buckley v. Valeo,* 424 U.S. at 15, 96 S.Ct. at 632. The Court noted that the constitutional right of association was derived from the role of group association to advocate *effectively* public and private points of view. *Id.* (citing *NAACP v. Alabama,* 357 U.S. 449, 460, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958)).

**15.** *Id.* at 19, 96 S.Ct. at 635.

**16.** *Id.* at 16, 96 S.Ct. at 633.

expenditure of money operates itself to introduce a nonspeech element or to reduce the exacting scrutiny required by the First Amendment."[17] "[T]he governmental interests advanced in support of the Act [i. e., FECA] involve 'suppressing communication.' The interests served by the Act include restricting the voices of people and interests groups who have money to spend and reducing the overall scope of federal election campaigns."[18] Following *Buckley*, then, it is plain that election laws regulating political expression require a demonstration of "compelling governmental interest" to withstand a constitutional challenge calling for "strict scrutiny" by the reviewing court.

### C. Compelling Governmental Interest

■ The Supreme Court considered three governmental interests adduced to support the contribution and expenditure ceilings: to prevent corruption, or, the appearance of corruption; to mute the voices of affluent groups and persons; and, to put a "brake" on the ballooning cost of election campaigns.[19] Only the first interest, to squelch corruption, was held constitutionally sufficient to support the FECA's $1,000 contribution limitation—a limitation on speech. The Court was crystal-clear in stating that Congress had no valid power to "equaliz[e] the relative ability of individuals and groups to influence the outcome of elections

..."; because, "the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment."[20]

In short, the Court has indicated the prevention of corruption is the singular compelling governmental interest justifying the limit on maximum contributions to candidates. Congress has constitutional authority, the Court held, to ensure that the marketplace of ideas in an election is not recast as a marketplace of "influence."

### D. Constitutional Distinction Between Contributions and Expenditures

The Court *did not accept* that even the compelling anticorruption governmental interest supported a limitation on *expenditures* in a campaign. The Court reasoned that limitations on *expenditures* were more restrictive of First Amendment rights than limitations on *contributions,* hence the congressional objective to protect the new contribution ceilings by closing the so-called loop-hole of "independent" expenditures was constitutionally insufficient.[21] Preventing corruption would justify the contribution ceilings but would not also justify expenditure ceilings that redress only tangentially the corruption problem (i. e., by "protecting" contribution limits from circumvention), yet severely impinge on free speech rights.[22] Controlling contributions,

---

**17.** *Id.* (citations omitted).

Unlike *[United States v.] O'Brien*, [391 U.S. 367 [88 S.Ct. 1673, 20 L.Ed.2d 672] (1978) (draft-card burning case)] where the Selective Service System's administrative interest in the preservation of draft cards was wholly unrelated to their use as a means of communication, it is beyond dispute that the interest in regulating the alleged "conduct" of giving or spending money [in a campaign] "arises in some measure because the communication allegedly integral to the conduct is itself thought to be harmful." 391 U.S., at 382 [88 S.Ct., at 1682].

*Id.* at 17, 96 S.Ct. at 634.

Obviously Congress *intends*, albeit neutrally, to regulate the speech-potential of money contributions and expenditures through the election laws it enacts. The giving and spending of

money is alluring to the candidate because of the speech-potential it provides to him or her, while to Congress that particular speech-potential also represents the enticement that could be the wedge of corruption, tainting the candidate and the election process. Thus Congress's regulatory intention with respect to campaign contributions and expenditures necessarily involves the regulation of speech.

**18.** *Id.* at 17, 96 S.Ct. at 634.

**19.** *Id.* at 25–26, 96 S.Ct. at 637–638.

**20.** *Id.* at 48–49, 96 S.Ct. at 648–649.

**21.** *Id.* at 44, 96 S.Ct. at 646.

**22.** *Id.* at 45, 96 S.Ct. at 647.

the Court believed, would exorcise *quid pro quo* from the political scene.[23] Impeding the opportunity for venal politician/contributor relationships was a constitutionally valid means of accomplishing the governmental interest in fighting corruption. Contribution ceilings preserve electoral integrity without directly impinging on the rights of individuals.[24] On the other hand, "the independent advocacy restricted by the [expenditure] provision does not presently appear to pose dangers of real or apparent corruption comparable to those identified with large campaign contributions."[25] For, "[u]nlike contributions, such independent expenditures may well provide little assistance to the candidate's campaign and indeed may prove counterproductive."[26]

The right of citizens and groups to make expenditures in a campaign poses, according to the Court, only the most attenuated danger of *quid pro quo*. Evidently, *spending* money can just not be equated with *giving* money as a source of possible corruption. The Court noted that the threat of corruption in political spending was mitigated to a large extent by coupling unlimited expenditures with a strict restriction on contributions (which the Court upheld). There was no evil in collecting small amounts from myriad individual contributors and then translating those funds into political communication spreading the candidate's message.[27] Thus the Court struck down FECA's section 608(e)(1) which limited independent expenditures, saying, "[t]hese

provisions place substantial and direct restrictions on the ability of candidates, citizens, *and associations* to engage in protected political expression, restrictions that the First Amendment cannot tolerate."[28]

A final perspective on *Buckley's* requirement of unlimited expenditures[29] comes from the more recent explication of the election laws in the *Republican National Committee v. Federal Election Committee* trilogy.[30] These cases upheld public financing of presidential elections. Candidates, the constitutional rationale goes, are permitted to forgo their own right to private contributions and unlimited expenditures in exchange for (exclusive) financing from the public coffers. This is a voluntary decision made by the candidate, presumably, because the candidate believes that his or her political communication is enhanced by public funding, even given the restrictions. The candidate's decision, however, cannot bind his or her supporters outside the official campaign. Public funding—and the election law after *Buckley*—leaves open to supporters a wide range of means to express their support and their politics. In fact, *Republican National Committee* would appear to mean that the restrictions associated with public funding (*e. g.*, no private contributions, expenditure ceilings, *etc.*) are permissible only because the rights of supporters are left untouched. "Most important", reflected the court, is that "uncoordinated expenditures are permitted without limit. Limitations on uncoordinated ex-

23. *Id.*

24. *Id.* at 58, 96 S.Ct. at 653.

25. *Id.* at 46, 96 S.Ct. at 647.

26. *Id.* at 47, 96 S.Ct. at 648.

27. *See id.* at 56 & n.64, 96 S.Ct. at 653 (quoting from Judge Tamm's separate opinion, concurring in part and dissenting in part, *Buckley v. Valeo*, 519 F.2d 821, 917 (D.C.Cir.1975)).

28. *Id.* at 58–59, 96 S.Ct. at 653–654 (emphasis added).

29. Pivotal to the Court's analysis of electoral integrity *vis a vis* independent expenditures

was the statutory provision that "controlled or coordinated expenditures are treated as contributions rather than expenditures under the Act." *Id.* at 46, 96 S.Ct. at 647. The Court recognized that it was one thing for Congress to restrict expenditures free from the candidate's control, but quite another for Congress (validly) to limit sham, "independent" expenditures, which being in the candidate's effective control amounted to nothing more than masked contributions and could be regulated as such.

30. 445 U.S. 955, 100 S.Ct. 1639, 64 L.Ed.2d 231 (1980), *aff'g summarily*, 487 F.Supp. 280 (S.D. N.Y.) (three-judge court), *and*, 616 F.2d 1 (2d Cir.) (*en banc*).

penditures were held unconstitutional in *Buckley v. Valeo.*" [31]

## III. SECTION 9012(f) LIMITATIONS ON EXPENDITURES BY POLITICAL COMMITTEES INHIBITS FIRST AMENDMENT FREEDOMS

■ The foregoing discussion of *Buckley* indicates the dubious constitutional quality of election law ceilings limiting amounts which may be independently expended in a campaign. The *Republican National Committee* cases still reserve a highly protected status for *independent expenditures* even since the advent of (conditional) public funding for presidential candidates (who accept the terms). Now we turn to our own constitutional analysis of section 9012(f)'s prohibition of independent expenditures by political committees in excess of $1,000. This analysis turns on two fundamental questions which will explore whether section 9012(f) is consistent with the First Amendment after *Buckley*: (1) Does the proposed spending by the defendant political committees constitute an "expenditure" question under *Buckley*?, and (2) Are political committees, under *Buckley*, entitled to the same First Amendment rights to make independent expenditures as individuals and "informal groups?" We answer both questions affirmatively and hold that section 9012(f) is facially unconstitutional.

### A. Political Committee Prohibition Is an Expenditure Limitation and Thereby Limits Speech

Under *Buckley* and the *Republican National Committee* cases the right of individuals and groups (outside of official campaigns) to make independent expenditures is a constitutional pillar of the election laws. Supporters of candidates have rights separate from the candidates they favor, rights which cannot be alienated by the candidate's choice with regard to public funding.[32] There is no constitutional reason that the organization of individual supporters of a candidate into groups called "political committees" should impugn the distinct and separate rights of campaign outsiders to sponsor political speech. Independent expenditures are the principal—and protected—source of this sponsorship.

### 1. This is Not a "Contribution" Case

*Buckley* indicated clearly that expenditure limitations jeopardize First Amendment rights more severely than do limitations on contributions.[33] Consequently, *Buckley* held that the governmental interest in cleansing the electoral process of possible corruption was not enough to validate restrictions on expenditures. A "contribution" case, on the other hand, is entitled to less-exacting judicial scrutiny because "the transformation of contributions into political debate involves speech by someone other than the contributor."[34] The case before this court is an "expenditure" case because it is precisely the speech of individual contributors which is hampered by the statutory restriction.

The defendant political committees are simply "pooling agents" for many small voices wishing to make intelligible political statements. The money expended by the committees pays for political communications which speak the language of their members and contributors. It is the speech of the contributors which is defrayed by the contributions. Earlier, we noted that political speech is expensive nowadays. It requires a lot of money and a lot of sophistication to yield effective communication in the political arena. Political committees pool money from individuals who are inter-

---

31. *Republican National Committee v. Federal Election Committee*, 487 F.Supp. 280, 286 (S.D.N.Y.) (three-judge court), *aff'd summarily*, 445 U.S. 955, 100 S.Ct. 1639, 64 L.Ed.2d 231 (1980) (citing *Buckley*, 424 U.S. at 39–51, 96 S.Ct. at 644–650).

32. *See Republican National Committee v. Federal Election Commission*, 487 F.Supp. 280, 285–86 (S.D.N.Y.) (three-judge court), *aff'd summarily*, 445 U.S. 955, 100 S.Ct. 1639, 64 L.Ed.2d 231 (1980).

33. *See* Part II. D. *supra.*

34. *Buckley v. Valeo*, 424 U.S. at 21, 96 S.Ct. at 636.

ested in politics and amplify their shared viewpoint into an efficient political message. A simple example explains the efficiency argument: One thousand politically motivated persons could each afford to buy a short classified advertisement in one thousand local newspapers; if, however, they join together, pool funds and integrate planning, they can purchase perhaps an advertisement in a national magazine, or a commercial on network television. There can be little doubt that an economy of scale enhances the informational impact of larger units of communication. Since it is beyond contention that individuals and "informal groups" may make unlimited independent expenditures to express their First Amendment rights, political committees may not be denied the same right merely because they are *efficient* groupings of like-minded individuals.

### 2. Individuals Speak Through Political Committees

The communication sponsored by the political committees is the language of their members and contributors because the contributions are made based on an understanding and community of political interest among all of the contributors and their political committees. The contributors do have power over the speech disseminated by the political committees. Political speech like this is possible in the first instance only because the contributors contribute to one particular committee or another. Contributors associate in a particular political committee because that committee will express their own thoughts, which benefit thereby from amplitude in numbers and professionalism. If a committee disappoints its membership, contributions will dry up.

To require that contributors to political committees literally draft their own television and other public messages is naive. These contributors express themselves through political committees—their First Amendment rights are not merely coextensive with their actual participation in drafting specific language. The language draft-

ed by the steering groups of the political committees reflects the political speech common to all of the member-contributors. That the language and format employed in the groups' public political communications have a professional touch does not make it any less the language of the individual contributor; one of the things he or she most wants is the professional touch to make his or her speech efficient and effective in the modern age. One thousand individuals have just as much right to join together to do this as one man or woman to do it alone. It emasculates the guaranteed right of association to disallow political committees from organizing and focusing the views of their adherents.[35] Thus the expenditures undertaken by the political committees represent an efficient exercise of First Amendment rights of associated individuals. This exercise warrants the highest protection under *Buckley* and *Republican National Committee*.

### 3. Speech Emanating from Political Committees Is Different from a Candidate's Speech

A word is in order to point out how speech promulgated through a political committee bears a different relation to its constituent contributors than does a candidate's speech to his or her constituent supporters (or, contributors to the nonpublicly funded candidate). A candidate strives to satisfy and mollify his or her supporters whenever possible; the politician, after all, depends considerably on pleasing supporters in order to maintain the campaign's momentum and coherence. Candidates are loosely tethered, not bound, to the notions of political speech held by their supporters. Political committees, on the other hand, are bound to reify the political thoughts of their member-contributors. The political communication by political committees is circumscribed by the expectations and understandings of the associates. The organizers of independent political committees, as agents and unlike candidates, are tied by their commitments to their particu-

---

35. *See* Part III. B. 2 *infra*.

lar contributors. The candidate, however, is free to exercise his or her own judgment as to what is in his or her own best interests based on a broader constituency. (This explains the apprehension with which many candidates' organizations look on the activities of uncoordinated and uncontrollable independent committees, but this does not and cannot limit the right of these independent committees to make their contribution to the robust political debate in any way they and their associates choose.)

The above comparison highlights once again the factual reality, as well as constitutional reality following *Buckley* and *Republican National Committee*, that the rights of candidates and their supporters are distinct. In *Buckley*, the Court realized that candidates could be ambivalent toward the independent political forays of their supporters. The Court noted that "[u]nlike contributions, such independent expenditures may well provide little assistance to the candidate's campaign and indeed may prove counterproductive." [36] Individuals, by associating in political committees, can express viewpoints that complement the positions of the favored candidate, or, they can express viewpoints which seek to influence or prod the candidate and the public. That individuals, through their political committees, hope for a candidate's election in no way means that their own speech is interchangeable with the candidate's. The Constitution entitles even mainstream individuals favoring mainstream candidates to communicate their separate, if sympathetic, views.

4. *Political Committees Cannot Wield the* Quid Pro Quo: *The Compelling Interest in Eliminating Corruption is Insufficient to Justify Section 9012(f)*

As elaborated in Part II above, the *Buckley* Court sustained FECA's contribution,

though not expenditure, limits on the basis of the compelling governmental interest in protecting elections from the taint of corruption. The Court saw in contributions to candidates the real possibility of corrupting *quid pro quos*. Independent expenditures, the Court felt, could not pose the same *quid pro quo* problem.

Similarly, the anticorruption interest cannot support the prohibition against *independent* expenditures by political committees. Any attempted exaction of a *quid pro quo* by a political committee would of course totally eliminate the constitutional protection reserved under *Buckley* for expenditures that are *independent*. A *coordinated*, non-independent expenditure by a committee might harbor a *quid pro quo*, but no more so than an individual's expenditures might. [37] Coordinated expenditures, by individuals or committees, are treated like contributions; [38] such contributions to a publicly funded candidate are of course illegal, but are inapposite to the constitutional issue here under consideration.

It is difficult, then, to imagine how the thousands of "small voices" associated together in a political committee could compromise a candidate for President. The political committees are venting the political ideas and commitments of their members, not of the candidate. The candidate will no more be beholden to the political committees than Presidents typically are to those elements of their constituency who voted for them. It is individuals themselves, acting in association, who are addressing political issues through independent expenditures. This public comment may persuade, and thereby influence decisionmakers, but it is protected by the First Amendment. [39]

A further check does now exist, however, on the power of political committees to

---

**36.** *Buckley v. Valeo*, 424 U.S. at 47, 96 S.Ct. at 648.

**37.** In fact, the large-scale operation of a political committee, requiring registration with the FEC, would be less capable of keeping a *quid pro quo* secret than could a wealthy individual

operating without the bright sunshine of public scrutiny.

**38.** *See* notes 7–9, 29 & accompanying text *supra*.

**39.** *See Let's Help Florida v. McCrary*, 621 F.2d 195 (5th Cir. 1980).

finance the views of their members: contributions to committees are restricted in amount by 2 U.S.C. section 441a(a)(1)(C). An individual may give only up to $5,000 to a political committee. This particular contribution limitation was not addressed directly in *Buckley*, but might be constitutionally permissible according to the *Buckley* rationale, which upheld other such limits.[40] What all of this clearly indicates is that while political committees may have the power to express sympathy and agreement with candidates, neither they nor individual members have the power to control the candidates they favor.

## B. *Political Committees Have First Amendment Rights Commensurate With Individuals' Rights*

In the preceding section we demonstrated that the prohibition of section 9012(f) raises an *expenditure* question under *Buckley*, thereby implicating highly protected free speech rights. We also showed how political committees simply pool funds and channel the joint speech of their members. We now turn to consider directly the closely related question: whether political committees, as multi-person organizations, have First Amendment rights so inferior to those of individuals that they fall out from the protective aegis of *Buckley*?

### 1. Buckley *Comprehends First Amendment Rights for Groups*

It is absolutely plain that free speech rights protected under *Buckley* extend be-

yond individuals. The Court there overturned "substantial and direct restrictions on the ability of candidates, citizens, *and associations* to engage in protected political expression. . . ."[41]

Furthermore, the Supreme Court has also emphasized that free expression may not be limited on the basis of the "identity of its source, whether corporation, *association*, union or individual."[42] As a "political committee" is defined in 26 U.S.C. section 9002(9) as "any committee, association or organization" which receives contributions or makes expenditures for the purpose of influencing a candidate's election, it should fall under the same general protection reserved for groups and associations wishing to communicate their interests to the public. The fact of receipt of contributions (to finance expenditures) does not distinguish political committees from any other association which takes an active position on a candidate. Likewise, a political committee is no different under the First Amendment from a wealthy individual who may, it has been decided, lawfully dedicate his entire fortune to make independent expenditures paying for the same public communications, *e. g.*, television, magazine, newspaper, billboard advertisements, *etc.*, which the committee would undertake. Individuals—wealthy or otherwise—groups and associations, and political committees all engage in the same speech activities. In all cases the speech is meant to express active support for or opposition to a particular candidacy; *i. e.*, to express affiliation with and approv-

---

**40.** Contribution limits to political committees have been upheld in two recent cases. *See California Medical Association v. FEC*, 641 F.2d 619 (9th Cir. 1980); *Mott v. FEC*, 494 F.Supp. 131 (D.D.C.1980). Congress could, perhaps, if these authorities are upheld, shrink reasonable limits on contributions as it might deem necessary to control further possibilities for corruption in the electoral process. We have no occasion here to express any view on the constitutionality of specific limitations on contributions to political committees. *But cf. California Medical Association v. FEC*, 641 F.2d 619 at 648–649 (9th Cir. 1980)

(Wallace, J., concurring and dissenting):
 Only in conjunction with outside donors will some unincorporated associations be able to

aggregate sufficient funds and expertise to compete effectively in the political market place with other more affluent 'persons' capable of huge personal expenditures.

**41.** 424 U.S. at 58–59, 96 S.Ct. at 653–654 (emphasis added). The Court also wrote: "It is clear that a primary effect of these expenditure limitations is to restrict the quantity of campaign speech by individuals, *groups*, and candidates." *Id.* at 39, 96 S.Ct. at 644 (emphasis added).

**42.** *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 777, 98 S.Ct. 1407, 1416, 55 L.Ed.2d 707 (1978) (emphasis added).

al for the ideas of that candidate, or the reverse. This active support or opposition is buttressed by the "profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide-open."[43]

### 2. Freedom of Association Requires That Individuals Be Allowed to Join in Political Committees

If section 9012(f) were not struck down, individuals of modest means would have no right to join with others to state their views to the public with some force. This right of association is crucial under the Constitution and recognized in *Buckley*. We believe what the *Buckley* Court said about FECA's contribution and expenditure limits is dispositive here on the right of individuals to join political committees and thereby amplify their ability to speak publicly on matters of political concern. The Court said:

> The Act's contribution and expenditure limitations also impinge on protected associational freedoms. Making a contribution, like joining a political party, serves to affiliate a person with a candidate. In addition, it enables like-minded persons to pool their resources in furtherance of common political goals. The Act's contribution ceilings thus limit one important means of associating with a candidate or committee, *but leave the contributor free to become a member of any political association and* to assist personally in the association's efforts on behalf of candidates. And the Act's contribution limitations permit associations and candidates to aggregate large sums of money to promote effective advocacy. By contrast, the Act's $1,000 limitation on independent expenditures "relative to a clearly identified candidate" precludes most associations from effectively amplifying the voice of their adherents, the original basis

for the recognition of First Amendment protection of the freedom of association. See *NAACP v. Alabama*, 357 U.S. at 460 [78 S.Ct. at 1170]. The Act's constraints on the ability of independent associations and candidate campaign organizations to expend resources on political expression "is simultaneously an interference with the freedom of [their] adherents," *Sweezy v. New Hampshire*, 354 U.S. 234, 250 [77 S.Ct. 1203, 1211, 1 L.Ed.2d 1311] (1957) (plurality opinion). See *Cousins v. Wigoda*, 419 U.S., at 487–488 [95 S.Ct., at 547–548]; *NAACP v. Button*, 371 U.S. 415, 431, 83 S.Ct. 328, 337, 9 L.Ed.2d 405 (1963).[44]

Politics is, after all, the unifying theme among members of political committees; their associational tie is the desire to affirm publicly their political viewpoint held in common. The organizers of political committees really only mobilize existing political sentiment looking for an outlet—the small size of contributions freely given by diverse contributors expecting no personal glory or prospects of hobnobbing with celebrities attests to that. This phenomenon of the so-called political committees *is* the right of association to express political views together with others, and thereby impress the public. An independent association dedicated to effective political expression which was not in essence a "political committee" would be either an exempted organization,[45] or terribly quaint. The Constitution protects potent political voices along with the more effete ones; the First Amendment ensures both that persons may speak, and that they may speak together.

### C. Conclusion—Section 9012(f) Violates the First Amendment

Given our holdings that section 9012(f) is an expenditure restriction, and is, therefore,

---

**43.** *New York Times v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964).

We note that the election law exempts press organizations, 26 U.S.C. § 9012(f)(2)(A), and tax-exempt "section 501(c)" organizations, *id.* § 9012(f)(2)(B), from the limitations applicable to political committees. This discrimination against political committees along with the dis-

crimination in favor of wealthy individuals is without constitutional foundation.

**44.** *Buckley v. Valeo*, 424 U.S. at 22–23, 96 S.Ct. at 636–637 (emphasis added).

**45.** *See* note 43 *supra*.

a powerful inhibition on political speech, we must strike down that section as it fails to survive the strict scrutiny required by the First Amendment. The compelling governmental interest to fight electoral corruption is insufficient, here as in *Buckley*, to justify what amounts to a direct limitation on political speech. Whereas a presidential candidate •by accepting public funds may choose for him or herself to do without unlimited contributions and expenditures, the candidate's public supporters have a separate, protected right to express themselves, individually or jointly. This preserves free access and full participation in the public debate.

## IV. COMMON CAUSE SUIT DISMISSED AS MOOT

■ In Count I of its lawsuit Common Cause sued for injunctive and declaratory relief to the effect that section 9012(f) applied to the defendant political committees and prohibited their proposed expenditures. This involves the same issue as in the action brought by the FEC, herein resolved against the FEC. Consequently, as in our 28 August 1980 Order, we dismiss Count I of Common Cause's action as mooted pursuant to our decision in the FEC action. We express no opinion whether Common Cause possessed the requisite Article III characteristics to press Count I of its lawsuit before this court.

## V. COMMON CAUSE MAY NOT SUE *TO ENFORCE* THE ELECTION LAWS

Count II of the Common Cause complaint does not implicate section 9012(f)'s prohibitions against independent expenditures. Rather, the theory of Count II is "that the defendant committees are not in fact independent of Ronald Reagan and his authoriz-

ed committees. The violations of the Fund Act that Count II alleges are violations that result from, and are premised upon, coordination and concerted action between defendant committees and the Reagan campaign."[46] We understand Count II to be an impermissible attempt by Common Cause, a private plaintiff, to enforce the Fund Act. We are without subject-matter jurisdiction under section 9011(b) to hear this claim.[47] The FEC is charged by statute with exclusive enforcement jurisdiction of the election laws, and moreover, the alleged illegal coordination would violate Fund Act provisions only with respect to *candidates*, not the defendant political committees; therefore, we hold also that Count II fails to state a claim upon which relief can be granted.

### A. *No Subject-Matter Jurisdiction to Hear a Coordination Claim*

■ Section 9011(b) of the Fund Act grants jurisdiction to three-judge district courts of the United States to entertain actions "to implement or construe" provisions of the Fund Act whether or not the plaintiff has exhausted administrative or other remedies.[48]

Count II, though, raises complicated questions of fact and difficult questions of election law policy which are without the scope of "implement or construe." It would be incongruous and cumbersome for a three-judge court, ordered by Congress to expedite its consideration,[49] to supervise extensive discovery and receive detailed factual evidence. This fact-finding, of course, is prerequisite to—and pertains only to—a determination of *compliance* with the election laws. A compliance issue is not one properly before a three-judge court charged with implementation and construction of a congressional act; and, an expedited judgment on compliance is not appropriate to a non-

---

**46.** Plaintiffs' Opening Brief on the Merits at 50.

**47.** Whether a single-judge district court would have jurisdiction under 28 U.S.C. § 1331 (1976) (federal question jurisdiction) is not before this court. Our holding dismissing Count II does not require explicit consideration of the Article III "case or controversy" requirement. As we

find ourselves without subject-matter jurisdiction we leave open the question of Common Cause's standing to bring Count II of its complaint.

**48.** 26 U.S.C. § 9011(b)(1) & (2) (1976).

**49.** 26 U.S.C. § 9011(b)(2) (1976).

expert three-judge court evaluating in the first instance circumstances surrounding an election controversy.

Congress ordered expedition in judicial review under section 9011(b) because elections come up fast and candidates, whoever they turn out to be, and others, need to know whether and how the election laws apply, and how much they provide.[50] So that elections run smoothly, Congress has provided only that three-judge courts (with direct appeal to the Supreme Court) shall: quickly construe doubtful (or, dubious) sections of the Fund Act, and/or quickly implement the Act's funding mechanism for the benefit of entitled candidates.

Three-judge district courts are convened typically in order to judge a statute's constitutionality on its face, or to clarify a statute's meaning and application pursuant to standard judicial statutory construction. Three-judge district courts were used in *Buckley* and *Republican National Committee* as a forum for constitutional challenges to the Fund Act.[51] In short, we view the section 9011(b) jurisdiction of this court narrowly. The narrow view is inherent in "implement or construe," by which we understand Congress to have limited the competence of this court to questions of fundamental statutory interpretation and to pressing pre-election questions of uncertainty regarding funds allocable to candidates.[52] Questions of Fund Act violations that require elaborate investigation of unique fac-

tual situations are not proper subjects for this court.

**B. *FEC Has Exclusive Enforcement Jurisdiction***

■ Congress has legislated in no uncertain terms with respect to FEC dominion over the election law. Section 437c(b)(1) of FECA reads:

> The Commission shall administer, seek to obtain compliance with, and formulate policy with respect to, this Act and Chapter 95 and Chapter 96 of Title 26 [*i. e.*, the Fund Act]. The Commission shall have exclusive jurisdiction with respect to the civil enforcement of such provisions.[53]

Since we view Count II as clearly an enforcement action, an action to ensure compliance with various provisions of the Fund Act, we must hold that FECA's section 437c(b)(1) precludes any consideration of alleged coordination of expenditures as pressed by Common Cause before this court.

The FEC itself adjudges Count II of the Common Cause complaint as an action to enforce the election laws.[54] The FEC which was allowed to intervene in the Common Cause action moved to dismiss Common Cause's complaint for lack of subject-matter jurisdiction.

The FEC's position on its enforcement jurisdiction has recently been vindicated by a panel of the Court of Appeals for this circuit.[55] That court held that violations of

---

**50.** *See* S.Conf.Rep.No.92–533, 92d Cong., 1st Sess. 53–54 (1971); 117 Cong.Rec.H. 12, 119 (9 Dec. 1971).

**51.** *See also Jones v. Branigin*, 433 F.2d 576 (6th Cir. 1970), *cert. denied*, 401 U.S. 977, 91 S.Ct. 1205, 28 L.Ed.2d 327 (1971) (substantial constitutional question prerequisite to convening of three-judge district court). All precedents are in accord supporting the proposition that three-judge district courts are extraordinary legal forums which are convened only to hear cases of special public interest.

**52.** The time-sensitivity of a candidate's—and others'—need to know about available funds explains § 9011(b)'s provision of jurisdiction notwithstanding any exhaustion of administrative remedies.

**53.** 2 U.S.C. § 437c(b)(1), as amended by Pub. L.No. 96–187, § 306(b)(1), 93 Stat. 1355 (1979).

**54.** FEC Motion to Dismiss at 11 & n.8. The FEC contended in footnote 8 that its "suit clearly differs from Common Cause's suit as the Commission's suit does not seek enforcement of the Act," rather, it "seek[s] only [a] declaratory judgment of the construction and constitutionality of 26 U.S.C. § 9012(f) pursuant to 26 U.S.C. § 9011(b)." In text the FEC wrote that Common Cause was simply "bring[ing] an enforcement action in the guise of a suit to implement or construe the statute."

**55.** *Carter-Mondale Reelection Committee, Inc. v. Federal Election Commission*, 642 F.2d 538 (D.C.Cir.1980).

the election laws[56] must first be brought before the FEC as within that agency's exclusive jurisdiction. The *Carter-Mondale* holding that the FEC has exclusive jurisdiction with respect to alleged campaign violations and noncompliance controls here.[57]

### C. Alleged Violations in Count II Do Not Apply to Political Committees

 Common Cause alleges in Count II that the defendant committees' proposed expenditures will violate sections 9003(b)(1), 9003(b)(2), 9012(a)(1), and 9012(b)(1) of the Fund Act. These provisions apply to presidential candidates who receive federal funding and must, therefore, limit their own expenditures and forgo private contributions.[58] Each of these sections can be violated only by *the candidate* receiving federal funds. Thus Count II does not state a claim alleging a violation of the Fund Act by the defendant political committees. This also confirms the impropriety of permitting a private party to enforce the election laws at its own discretion. For these reasons we dismiss Count II also for failure to state a claim upon which relief can be granted.

### CONCLUSION

Consistent with our Orders of 28 August 1980, we deny the FEC's motion for summary judgment and grant summary judgment for the defendant political committees and individuals on the grounds that section 9012(f) violates the Constitution. We dismiss Count I of the complaint brought by Common Cause as moot; Count II is dismissed for lack of subject-matter jurisdiction and for failure to state a claim.

*So ordered.*

---

**56.** The alleged violations in *Carter-Mondale* involved the same issues of coordination between political committees and the official Reagan campaign that are the substance of Common Cause's Count II. *See id.* at 542.

**57.** "Exclusive jurisdiction," held the court, was especially powerful in the election law context. The law "provides for FEC enforcement through both informal consent proceedings and formal proceedings." *Id.* at 543. An FEC investigation may completely absolve the challenged conduct, or may result in a partial vindication resolved by a consent decree. The intrusion of massive discovery requests by a private party, like Common Cause, would plainly upset the delicate balance in the structure of campaign regulation. Common Cause would unsettle the coherent administration of election law policy and practice if allowed to go forward with Count II of its complaint.

**58.** Candidates may not restrict the individual rights of their supporters as a result of the choice to accept public funding. *See* notes 30–32 & accompanying text *supra*.