589 F.Supp. 646 (1984)
FEDERAL ELECTION COMMISSION, Plaintiff,
v.
MASSACHUSETTS CITIZENS FOR LIFE, INC., Defendant.
Civ. A. No. 82-609-G.
United States District Court, D. Massachusetts.
June 29, 1984.
*647 R. Lee Andersen, Charles N. Steele, Gen. Counsel, Federal Election Com'n, Washington, D.C., for plaintiff.
Francis H. Fox, Alexandra Leake, Bingham, Dana & Gould, Joseph D. Alviani, New England Legal Foundation, Boston, Mass., for defendant.

OPINION
GARRITY, District Judge.
This is an enforcement proceeding by the Federal Election Commission (FEC) seeking to invoke the provisions of § 441b of the Federal Election Campaign Act of 1971, as amended, 2 U.S.C. § 441b, against the defendant Massachusetts Citizens for Life, Inc. (MCFL) for having made expenditures of corporate funds[1] in connection with the 1978 election of Massachusetts candidates for federal office. Jurisdiction rests upon 28 U.S.C. § 1345 and 2 U.S.C. § 437g(a)(6)(A).[2] Cross-motions for summary judgment were filed by the parties on a record consisting of affidavits, answers to interrogatories and a notice to admit facts and depositions. Exhaustive legal memoranda, which incidentally discussed many subissues and side issues and contingent issues and alternative grounds not reached in this opinion, were filed before and subsequent to oral argument.

I
The facts are essentially undisputed. The defendant is a Massachusetts corporation formed in January 1973 for the following purpose:
To foster respect for human life and to defend the right to life of all human beings, born and unborn, through educational, political and other forms of activities and in addition to engage in any other lawful act or activity for which corporations may be organized under Chapter 180 of the general Laws of the Commonwealth of Massachusetts.
In September 1978 MCFL published an eight-page "Special Election Edition" of the MCFL newsletter and mailed it to 58,025 persons. The defendant expended from its *648 general treasury funds $475 to prepare the edition, $2100 to print it and $6800 for mailing. Some minor errors in the voting records of three candidates were discovered and, later in the month, a revised partial edition was printed at a cost of $492 for 20,000 copies. MCFL's total expenditure for the two printings and distributions was $9812.
The first-page headline of the editions read, "EVERYTHING YOU NEED TO KNOW TO VOTE PRO-LIFE". The editions listed all candidates in an upcoming September 19, 1978 primary election for Congress, state Governor and state legislature and reported their positions on three pro-life issues: a "constitutional human life amendment", legislation to prohibit the use of tax funds for abortions, and legislation to provide positive alternatives to abortion. The positions of incumbents were derived from their voting records and of non-incumbents from their answers to questionnaires. The editions urged that recipients "vote pro-life" and carried photographs only of congressional and gubernatorial candidates whose records or promises met with MCFL approval. However, the text also stated, "This special election edition does not represent an endorsement of any particular candidate" and FEC has not contended that the publication constituted express advocacy for any of the candidates.

II
Before entering the thicket of statutes and regulations governing federal elections, some preliminary observations may be in order. First, this is probably a case of first impression. To the best of our knowledge plaintiff has not heretofore sought to invoke the provisions of § 441b[3] against a noncommercial corporation for making expenditures in connection with either a primary or final election to federal office. Judicial interpretations of § 441b or its predecessor are found in criminal cases, e.g., United States v. Chestnut, S.D. N.Y.1975, 394 F.Supp. 581, civil actions for enforcement of administrative subpoenas, e.g., FEC v. Long Island Tax Reform Immediately Committee (TRIM), 2 Cir.1980, 616 F.2d 45, or pursuant to the disclosure and reporting provisions of other sections of the Federal Election Campaign Act, e.g., FEC v. American Federation of State, County and Municipal Employees, D.C. D.C.1979, 471 F.Supp. 315, or in cases concerning campaign contributions, e.g., FEC v. National Right to Work Committee (NRWC), 1982, 459 U.S. 197, 103 S.Ct. 552, 74 L.Ed.2d 364.[4] Civil penalties and contempt adjudications are among the sanctions now provided in § 437g for violations of § 441b. The complaint in the instant case seeks a civil penalty of $5,000.
Secondly, the facial constitutionality of § 441b is not an open question. The compelling government interest in preserving the integrity and appearance of integrity of federal elections that underlies the regulation of campaign contributions and expenditures has been long established, at least since United States v. Automobile Workers, 1957, 352 U.S. 567, 77 S.Ct. 529, 1 L.Ed.2d 563. The constitutionality of the *649 FECA was explored in depth in the "watershed case" of Buckley v. Valeo, 1976, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659, in which the opinions per curiam and of the individual Justices exceeded 200 pages. Likewise, the precious First Amendment interests here involved need simply to be recognized, not explicated. We subscribe to Judge Sweet's statement in FEC v. Weinsten, S.D.N.Y.1978, 462 F.Supp. 243, 249:
For this court to elaborate on the nature of free speech would be presumptuous in view of the exhaustive literature in this field and the opinions already referred to.
The derivation and relationship between First Amendment freedoms and democracy's dependence upon honest and apparently honest elections have been described in numerous scholarly articles, e.g., Corporate and Labor Union Activity in Federal Elections: "Active Electioneering" as a Constitutional Standard, 49 Geo.Wash.L.Rev. 761 (1981), and decisions, e.g., United States v. Chestnut, supra at 588-591, Common Cause v. Schmitt, D.C.D.C.1980, 512 F.Supp. 489, 493-500.
Thirdly, in ruling upon the parties' cross-motions for summary judgment we are mindful of the "basic principle that .... If a court can decide a case on non-constitutional grounds, it should not stray into the field on constitutional analysis." FEC v. TRIM, supra at 51-52. See also the classic exposition of this principle in United States v. Automobile Workers, supra 352 U.S. at 590-592, 77 S.Ct. at 540-542. This does not mean, however, that the statute can be construed without awareness of the impact of plaintiff's interpretation of § 441b on the defendant's freedoms of speech and association. First Amendment interests permeate the issues of statutory construction here presented, and Congress will not be presumed to have been insensitive to them.

III
Section 441b(b)(2) provides the applicable definition[5] of "expenditure", as follows:
For purposes of this section ... the term "contribution or expenditure" shall include any direct or indirect payment, distribution, loan, advance, deposit, or gift of money, or any services, or anything of value ... to any candidate, campaign committee, or political party or organization, in connection with any [federal] election....
Section 441b thus outlaws indirect payments or gifts of anything of value to any candidate, campaign committee or political party or organization. Was defendant's publication of the Special Election Editions intended by Congress to be such a payment or gift? We think not. The publication was uninvited by any candidate and uncoordinated with any campaign.[6] When competing candidates were on the same side of the abortion issue, it did not suggest a preference. To the extent that it was distributed beyond defendant's membership, it probably lessened rather than enhanced the prospects of election of candidates subscribing to defendants' platform which, according to public opinion polls, is opposed by most citizens. It listed the positions of hundreds of candidates on a single political issue, without however expressly advocating the election or defeat of any particular candidate or belittling the importance of other election issues. The publication cost less than $10,000 and nearly 500 candidates were surveyed, an alleged "expenditure" of about $20 per candidate. If the space in *650 the editions devoted to candidates for federal office be segregated from the rest, the cost of the papers was about $4,000 for 50 candidates, or $80 per  in either case, hardly the sort of "large" expenditures, repeatedly referred to in Buckley v. Valeo, supra, or "indirect contributions" which the 1947 amendment to the Federal Corrupt Practices Act was aimed at. See United States v. CIO, 1948, 335 U.S. 106, 115, 122, 68 S.Ct. 1349, 1357, 92 L.Ed. 1849.

IV
We also hold that the tabloids in question were not expenditures prohibited by § 441b because they were "news story, commentary, or editorial distributed through the facilities of any ... periodical publication" and hence exempted from the definition of expenditure by the 1974 amendments to FECA, found now in 2 U.S.C. § 431(9)(B)(i) (before 1980 at § 431(f)(4)(A)).[7] They listed the voting records of incumbents on three legislative proposals pertaining to abortions and reported the responses to questionnaires regarding these proposals received from nonincumbent candidates; and urged readers to vote pro-life. In our opinion, the compilation of voting records and questionnaire responses was news, probably not available elsewhere; and the call to vote pro-life, in conjunction, incidentally, with a quotation from Thomas Jefferson, was editorial.
The closer question is whether the special election editions were "periodical publications"[8] within the meaning of the statutory exemption. We find that they were. First, they were similar in newsprint, sheet form, size and format to the "MCFL Newsletter" that the defendant published relatively regularly, subject only to the availability of sufficient funds, for five years before 1978. The newsletters typically filled 6-10 pages of newsprint and included explanations and endorsements of its opposition to abortions, reports of political developments and judicial rulings on abortion-related issues, announcements of social activities for members and appeals for funds. Special election editions were published prior to all elections since 1974, thrice before 1978. Secondly, the legislative history of the newspaper exemption shows that Congress intended that it be a broad exemption, coextensive with the First Amendment. The relevant House of Representatives committee report, H.R.Rep. No. 1239, 93d Cong., 2d Sess. 4 (1974), stated that
it is not the intent of the Congress in the present legislation to limit or burden in any way the first amendment freedoms of the press or of association. (emphasis added)
The same report indicates that the amendment would conform the statute to preexisting law, which would presumably include the caveat expressed in United States v. CIO, supra, at 123, 68 S.Ct. at 1357, as follows:
It would require explicit words in an act to convince us that Congress intended to bar a trade journal, a house organ or a newspaper, published by a corporation, from expressing views on candidates or political proposals in the regular course of its publication. It is unduly stretching language to say that members or stockholders are unwilling participants in such normal organizational activities, including the advocacy thereby of governmental policies affecting their interests, and the support thereby of candidates thought to be favorable to their interests. *651 Another indication of the breadth of the news exemption from FECA's definition of "expenditure" was Congress' simultaneous enactment of a narrower provision exempting newspapers from the reporting and disclosure provisions of FECA, § 437a.[9]

V
If § 441b were intended by Congress to prohibit MCFL's expenditures of printing and distributing the newsletters in question, it would be unconstitutional under the First Amendment as applied to MCFL because violative of MCFL's freedoms of speech, press and association. Our opinion on this point is based upon the junction in this case of three distinctive features of the expenditures at issue. They were (a) independent of any candidate or party, (b) by a nonprofitmaking corporation formed to advance an ideological cause and (c) for the purpose of publishing direct political speech. We discuss each in turn.
The only compelling governmental interest[10] that would justify the application of § 441b to the defendant's Special Election Editions, to wit, the prevention of real or apparent corruption, has not been shown by plaintiff to be implicated here. The danger that the newsletters might, like large campaign contributions, "secure a political quid pro quo from current and potential office holders", Buckley v. Valeo, supra 424 U.S. at 26, 96 S.Ct. at 638, or create political debts, First National Bank of Boston v. Bellotti, supra at 788, fn. 26, 98 S.Ct. at 1422 fn. 26, or "pose a perceived threat of actual or potential corruption," California Medical Assn. v. FEC, 1981, 453 U.S. 182, 101 S.Ct. 2712, 69 L.Ed.2d 567, concurring opinion of Blackmun, J. at 203, has not been shown. The election editions were accurate tabulations of all candidates' positions on three public issues espoused by MCFL, without express advocacy of the election of a particular candidate. The costs of their composition and distribution were made without the cooperation, consultation, request or suggestion of any candidate, see § 431(17) of the Act, and hence independent expenditures, a fact which Buckley v. Valeo, supra 424 U.S. at 47, 96 S.Ct. at 648, quoted ante at fn. 5, says "alleviates the danger that expenditures will be given as a quid pro quo for improper commitments from the candidate." (emphasis added). In our opinion, this independence under the circumstances of the instant case not merely alleviates "the danger" which is an essential predicate to curtailment of MCFL's First Amendment freedoms  it eliminates it.
Other governmental interests have sometimes been advanced in support of § 441b: to protect shareholders from having corporate funds used to support political candidates to whom they may be opposed, FEC v. NRWC, supra 459 U.S. at 207-208, 103 S.Ct. at 559-560, and "to sustain the active, alert responsibility of the individual citizen in a democracy for the wise conduct of government." United States v. Auto Workers, supra 352 U.S. at 575, 77 S.Ct. at 533. It is self-evident that the expenditures at issue in this case are not contrary to these two interests. The expenditures in question clearly carry out the widely publicized purpose of MCFL's existence, viz., opposition to abortion, of which all members must be aware before sending in donations. As for promoting citizen responsibility, publication of tabloids urging readers to go to the polls and vote for candidates sharing their views on an important public issue is scarcely inconsistent with that governmental interest.
Buckley v. Valeo, supra 424 U.S. at 44-48, 96 S.Ct. at 646-649, ruled that independent expenditures are constitutionally protected if made by an individual or group "in order to engage directly in political *652 speech." California Medical Assn. v. FEC, 1981, 453 U.S. 182, 195, 101 S.Ct. 2712, 2721, 69 L.Ed.2d 567. The single differentiating factor in the instant case from Buckley is the defendant's corporate form. But that difference cannot be dispositive. The corporate identity of the speaker does not deprive speech of what otherwise would be its clear entitlement to protection. First National Bank of Boston v. Bellotti, supra 435 U.S. at 778-786, 98 S.Ct. at 1416-1421. The dissenting justices in that case emphasized the nature of commercial corporations. Probably they would not have dissented had the holding been limited to nonprofitmaking corporations like MCFL. This is indicated in Mr. Justice White's dissenting opinion, at 805, 98 S.Ct. at 1430 as follows:
It is clear that the communications of profitmaking corporations are not "an integral part of the development of ideas, of mental exploration and of the affirmation of self." They do not represent a manifestation of individual freedom or choice. Undoubtedly, as this Court has recognized, see NAACP v. Button, 371 U.S. 415 [83 S.Ct. 328, 9 L.Ed.2d 405] (1963), there are some corporations formed for the express purpose of advancing certain ideological causes shared by all their members, or, as in the case of the press, of disseminating information and ideas. Under such circumstances, association in a corporate form may be viewed as merely a means of achieving effective self-expression. But this is hardly the case generally with corporations operated for the purpose of making profits. (emphasis added).
Thus the second critical element of MCFL's constitutional claims is the nature of the defendant corporation.
The third is the purpose of the expenditures the FEC seeks to forbid: the publication of direct political speech, not the solicitation of contributions from 267,000 individuals as in FEC v. NRWC, supra, nor "speech by proxy"[11] by means of contributions to a political action committee as in California Medical Assn. v. FEC, supra, (such "speech by proxy" ... is not the sort of political advocacy ... entitled to full First Amendment protection. Id. 453 U.S. at 196, 101 S.Ct. at 2722. Emphasis added.) Brown v. Hartlage, 1982, 456 U.S. 45, 102 S.Ct. 1523, 71 L.Ed.2d 732, held the Kentucky Corrupt Practices Act unconstitutional as applied to a candidate for public office who made a campaign promise to serve if elected at a salary less than that fixed by law, finding, at 56-57, 102 S.Ct. at 1530, "that the statements of petitioner Brown ... were very different in character from the corrupting agreements and solicitations historically recognized as unprotected by the First Amendment." (emphasis added). Similarly here, the defendant's special election editions were the very antithesis of a corrupting agreement or contribution. They were open, strived for accuracy, reported on every candidate regardless of prospects of election and urged readers to vote on election day. They sought to influence incumbents and candidates solely by means of informed voter reaction to the candidates' positions on an important public issue. Far from being an improper influence, or eroding public confidence in the electoral process, or threatening its integrity, FEC v. NRWC, supra 459 U.S. at 207-208, 103 S.Ct. at 559-560, they would seem to promote rather than undermine the honest functioning of representative government.

Conclusion
In their briefs and oral arguments the parties have addressed in many ways but always indirectly an issue of characterization that we feel is best stated explicitly: in publishing its Special Election Editions in 1978, was the defendant spending or speaking? Plaintiff would answer the former and defendant would answer the latter. Both would, of course, be correct, but only partially so. Essentially, however, we *653 agree with the defendant that the costs of the publications in question are more accurately characterized as speaking than spending and that in placing the FCPA in the FECA as new § 441b Congress did not intend to proscribe the type of expenditure made by the defendant in 1978.
Alternatively, and conditionally upon our having misinterpreted § 441b and § 431(9)(B)(i), we have observed the precept, "regulation of First Amendment rights is always subject to exacting judicial scrutiny", Citizens Against Rent Control v. Berkeley, supra 454 U.S. at 298, 102 S.Ct. at 438, and found that to apply the Federal Corrupt Practices Act, 2 U.S.C. § 441b, to defendant MCFL's 1978 Special Election Editions would violate its rights to freedom of speech, press and association under the First Amendment of the United States Constitution. Accordingly it is ordered that plaintiff's motion for summary judgment be denied and that defendant's motion be granted and that judgment be entered for the defendant dismissing the complaint.
NOTES
[1] After the FEC brought this suit, defendant MCFL established a separate, segregated fund to be utilized for political purposes (often called a political action committee or PAC) pursuant to 2 U.S.C. § 441b(b)(2)(C), and presumably the costs of any current MCFL newsletters are borne by this PAC. However, this action has not on that account become moot, since the complaint seeks payment to the United States Treasury of a $5,000 civil penalty.
[2] Section 437g jurisdiction may be contrasted with that under 2 U.S.C. § 437h providing for actions to construe the constitutionality of any provision of the Federal Election Campaign Act, in which the district court immediately certifies questions of constitutionality to the Court of Appeals, which sits en banc. See Bread Political Action Com. v. FEC, 7 Cir. 1979, 591 F.2d 29, Athens Lumber Co., Inc. v. FEC, 11 Cir. 1983, 689 F.2d 1006, 1009-1011, en banc 718 F.2d 363, cert. den. ___ U.S. ___, 104 S.Ct. 1580, 80 L.Ed.2d 114 (1984), and FEC v. TRIM, infra, at 49-51.
[3] Section 441b is still frequently referred to as the Federal Corrupt Practices Act (FCPA), see, e.g., First National Bank of Boston v. Bellotti, 1978, 435 U.S. 765, 788 n. 26, 820, 98 S.Ct. 1407, 1422 n. 26, 1438, 55 L.Ed.2d 707, despite its inclusion in the FECA since 1976 in lieu of the predecessor criminal statute, former 18 U.S.C. § 610.
[4] After the Supreme Court decision in the NRWC case, the parties filed supplemental memoranda on the question whether it is controlling precedent in this case. In our opinion, it is not. Plaintiff argues that the Supreme Court treated NRWC's solicitation of campaign contributions from nonmembers as the making of prohibited expenditures. We believe, however, that a fair reading of its unanimous opinion leaves no doubt that the Court was addressing the legality of NRWC's fundraising, viz., solicitation of contributions to be donated to political candidates or campaign committees, not the legality of its expenditures. See Democratic Party v. National Conservative P.A.C., E.D. Pa.1983, 578 F.Supp. 797, 820. For one thing, the opinion did not quote or even cite the statutory definitions of "expenditure", § 441b(b)(2) and § 431(f) except, at 201, in passing reference to separate segregated funds. Also, NRWC discussed only freedom of association, not freedom of speech.
[5] In our opinion, this definition is exclusive despite use of the verb "shall include" rather than "shall mean" because § 431(f)(4)(H), the definition section of FECA, in effect adopts the § 441b(b)(2) definition.
[6] "Unlike contributions, such independent expenditures may well provide little assistance to the candidate's campaign and indeed may prove counterproductive. The absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a quid pro quo for improper commitments from the candidate." Buckley v. Valeo, supra, 424 U.S. at 47, 96 S.Ct. at 648.
[7] The complete provision is: The term "expenditure" does not include  any news story, commentary, or editorial distributed through the facilities of any broadcasting station, newspaper, magazine, or other periodical publication, unless such facilities are owned or controlled by any political party, political committee, or candidate. There is no claim in this case that the defendant's facilities are owned or controlled by any political party, committee or candidate.
[8] The term is not defined elsewhere in the statute or regulations. The Commission has suggested, in accordance with FEC Advisory Opinion AO 1980-109, CCH Guide ¶ 5556, that we borrow and apply the definition of the term "bona fide newspaper" in regulations at 11 CFR § 110.13, as elaborated at 44 Fed.Reg. 76735 (12/27/79). But § 110.13 concerns the staging of political debates, which in our view presents quite different problems.
[9] This provision was invalidated as unconstitutional by the Court of Appeals decision in Buckley v. Valeo, D.C.Cir.1975, 519 F.2d 821, 869-78, an aspect of the case not reviewed by the Supreme Court in its landmark decision.
[10] "Buckley identified a single narrow exception to the rule that limits on political activity were contrary to the First Amendment." Citizens Against Rent Control v. Berkeley, 1981, 454 U.S. 290, 296-297, 102 S.Ct. 434, 437, 70 L.Ed.2d 492 (emphasis added).
[11] "[T]his attenuated form of speech does not resemble the direct political advocacy to which this Court in Buckley accorded substantial constitutional protection." California Medical Assn. v. FEC, supra, 453 U.S. fn. 16 at 196, 101 fn. 16 at 2721.